491 F.2d 8
 Fed. Sec. L. Rep. P 94,438
Hoyt AYERS, on behalf of himself, etc., Plaintiffs-Appellees,
v.
Rick WOLFINBARGER et al., Defendants, Maurice Olen, Crown
ServicesCorporation, United Services Association
of Alabama, Inc., Defendants-Appellants.
 No. 73-1700.
 United States Court of Appeals, Fifth Circuit.
 March 14, 1974, Rehearing and Rehearing En Banc Denied May 6, 1974.
 
 Morris K. Sirote, Birmingham, Ala., for defendants-appellants.
 J. Vernon Patrick, Jr., Marvin Cherner, Birmingham, Ala., for plaintiffs-appellees.
 Before BELL, DYER and SIMPSON, Circuit Judges.
 DYER, Circuit Judge:
 
 
 1
 In this derivative and stockholders class action, which sought damages for violations of the federal and state securities laws,[1] Crown Services Corporation and United Services Association of Alabama, Inc., two companies controlled by Maurice Olen, were alleged to be under-writers and controlling persons of Diversoco, Inc., the shares of which were ultimately sold to the plaintiffs through fraudulent misrepresentations and omissions. From a judgment for the plaintiffs, entered upon jury verdicts, Olen, Crown and United appeal. We conclude that there was insufficient evidence to sustain the verdicts and judgment and accordingly reverse.[2]
 
 
 2
 On February 1, 1966, The First National Financial Corporation of Alabama was granted a corporate charter under the laws of Alabama with an authorized capital of one million shares with a par value of ten cents per share. On February 2, 1966, the corporate name was changed to Second National Financial Corporation of Alabama. Crown, a Florida corporation, and United, an Alabama corporation, were the organizers of First National and Second National. Olen was president of and controlled both Crown and United. Crown purchased 100,000 shares and United purchased 145,250 shares of Second National at ten cents per share. United also subscribed to an additional 255,000 shares.
 
 
 3
 Second National filed a registration statement with the Alabama Securities Commission and on July 15, 1966, made a public offering under its prospectus to sell 400,000 shares at one dollar per share to residents of Alabama. From that date to November 2, 1966, Second National sold about 28,000 shares to twenty-six residents of Alabama at one dollar per share.
 
 
 4
 In September 1966, Olen was indicted and pled guilty to violations of the federal securities and mail fraud laws in matters unrelated to the Second National offering. Because the Second National prospectus showed Olen to be in a position to control the company's affairs, his counsel advised him to terminate the offering made by Second National in the prospectus of July 15, 1966, by either selling Crown's and United's stock in Second National, coupled with a requirement that the purchaser make a tender offer to the other stockholders to purchase their interests for the price paid by them for the stock, or by making a refund to all stockholders of Second National for the full amount of the purchase price paid by them.
 
 
 5
 In October 1966, Olen discussed with Wolfinbarger his desire to dispose of the stock held by Crown and United in Second National. Wolfinbarger was then Chairman of the Board of First American Life Insurance Company of Mobile, Alabama. The Insurance Commissioner of Alabama had declared the capital of First American to be impaired and had prohibited it from selling insurance or selling its stock. Among First American's stock salesmen were Withrow, Marine and Niesen. Wolfinbarger and the three stock salesmen discussed a proposed purchase of the Second National stock held by Crown and United that Wolfinbarger had negotiated with Olen. It was finally agreed however, that Wolfinbarger would draw from the transaction and that Withrow, Marine and Niesen, none of whom knew Olen, would acquire the stock of Second National from Crown and United.
 
 
 6
 On November 2, 1966, a stock purchase agreement was entered into, by the terms of which United sold 144,750 shares and Crown sold 100,000 shares of Second National to Withrow, Marine and Niesen for ten cents per share or a total of $24,475.00. Of this total purchase price $5,075.00 was payable in cash, and the balance of $19,400.00, together with interest at six percent, was evidenced by a promissory note payable in the amount of $2,400.00 on November 16, 1966, and beginning on December 12, 1966, in monthly installments of $1,463.13 until the note was satisfied. As security for the payment of the unpaid purchase price the agreement provided for the escrow of the stock and further provided inter alia:
 
 
 7
 4. Security for Payment of Purchase Price. All rights in connection with or incident to the ownership of such shares of stock shall be vested solely in the Buyers, subject to the provisions of the Escrow Agreement and the rights of the Sellers as pledgees. In the case of default . . . by the Buyers, the Sellers shall have the rights as heretofore outlined as well as all rights contained in the promissory note, but strictly subject to Sellers giving Buyers written notice of any such default in the terms and conditions of the aforesaid promissory note by Certified Mail . . ., and further provided that if said payment is made within ten (10) days of the receipt by Buyers of such Certified Mail notice it shall be accepted by Sellers without penalty, acceleration of said promissory note or forfeiture of any security hereby pledged; . . . 9. Representations of Buyers. The Buyers do hereby warrant and agree with the Sellers that: (a) Each of the Buyers is a bona fide resident of the State of Alabama. (b) The Buyers will, at closing, make an offer in writing to all parties that purchased stock of the company by public offering made by Company to purchase from them immediately for cash their shares of stock in the Company and their outstanding subscriptions to stock of the Company on the basis per share they paid for such stock. Buyers agree to make the same offer to the original Directors of the Company.
 
 
 8
 The promissory note executed by the purchasers contained the ten-day notice requirement provided in the stock purchase agreement.
 
 
 9
 The escrow agreement permitted stock to be withdrawn by the purchasers in proportion to the payment of any installment of the purchase price, provided that 50,750 shares would not be released until the last monthly payment was made. So long as they were not in default, the purchasers were given the right to vote the stock held by the escrow agent.
 
 
 10
 At the time of closing on November 2, 1966, Withrow, Marine and Niesen also executed and delivered to United a promissory note for $25,525.00 payable in monthly installments of $542.36 beginning on December 12, 1966, the consideration for which was an assignment by United to the purchasers of United's right to purchase 255,250 shares of Second National for ten cents per share. Contemporaneously, by an exchange of letters dated November 2, 1966, Withrow, Marine and Niesen agreed to pay Second National ten cents per share on all sales by them of either the subscription rights assigned to them by United, or upon the exercise by them of the subscription rights resulting in the issue of Second National stock to them. This payment was in addition to the payment of the $25,525.00 to United for the assignment of United's subscription rights to 255,250 shares of Second National stock. United, on the other hand, agreed that if Withrow, Marine and Niesen, the purchasers of the subscription rights, notified it in writing that Second National had canceled the subscription rights and relieved United from any liability for the payment of its subscription obligation, United would, in turn, declare the remaining sums at that time due and owing under the promissory note as having been paid and satisfied.
 
 
 11
 All of the officers and directors of Second National resigned on November 2, 1966, and thereafter took no part in its affairs. New officers and a new board of directors were elected, none of whom had any connection with Crown, United or Olen. Subsequently, the name of Second National was changed to Diversoco, Inc., and the home office of the company was moved from Mobile to Birmingham, Alabama.
 
 
 12
 Twenty-six stockholders had subscribed to 28,725 shares in Second National subsequent to the publication of the July 15, 1966, prospectus and before the November 2, 1966, stock purchase agreement for which shares they had paid to the company $14,725.00.[3] On November 3, 1966, these stockholders were informed by letter of the stock purchase agreement, and an offer was made to purchase all of the shares owned by them in Second National at their per share cost. An offer was also made to assume the obligation of these stockholders under the terms of any outstanding subscription agreement which they might have made with Second National. Although the record is not entirely clear, it appears that between 10,000 and 16,000 shares were repurchased from the stockholders at their actual cost by Withrow, Marine and Niesen, shortly after November 3, 1966.
 
 
 13
 The 244,750 shares purchased by Withrow, Marine and Niesen from Crown and United were held in escrow for over two years and were never sold to the public. During the escrow period the purchasers were late in making the installment payments on two or three occasions, but the sellers gave no notice of default. All of the shares were finally released to the purchasers on March 2, 1968.
 
 
 14
 Once the purchasers gained control of Diversoco, Inc., they exercised their subscription rights bought from United (for which they were obligated to pay United and Diversoco ten cents each per share) and sold as a secondary offering 226,707 shares at fifty cents per share or $113,353.00.[4] Principally on the basis of a Diversoco prospectus dated September 30, 1967, the primary issue of 400,000 shares was sold to the public for one dollar per share.
 
 
 15
 On and after November 2, 1966, when Withrow, Marine and Niesen took over the affairs of the corporation, there is not the slightest doubt that they were controlling persons[5] of Diversoco, Inc. (formerly Second National) and that as sellers[6] of its stock they committed wholesale violations of the securities acts. The prospectus issued by Diversoco on September 30, 1967, was misleading and omitted material facts;[7] the stock was sold publicly without having been registered as required;[8] and at the same time the public was paying one dollar per share, Withrow, Marine, Niesen and later Liddell were selling an insider secondary issue for fifty cents per share.[9] In view of these violations the question is then whether Crown, United and Olen are liable for what occurred after November 2, 1966.
 
 
 16
 Since the jury found the defendants liable, '(this Court is) 'duty bound to accept all evidence in favor of the verdict as true and to give such evidence the benefit of all permissible inferences that would help sustain the jury's decision.' Little v. Green, 428 F.2d 1061, 1066 (5th Cir. 1970). See also Southern Pacific Co. v. Jordan, 395 F.2d 209 (5th Cir. 1968); Fidelity and Casualty Co. of New York v. Funel, 383 F.2d 42, 44 (5th Cir. 1967).' Hill York Corp. v. American Internat'l Franchises, Inc., 5 Cir. 1971, 448 F.2d 680 at 684.
 
 
 17
 Plaintiffs contend that Crown, United and Olen are liable as sellers of Diversoco stock. Plaintiffs' argument is based on the following thesis: Wolfinbarger, an acquaintance of Olen, was president of First American Life Insurance Company, the capital of which had become impaired and which was prohibited from selling insurance or its own capital stock. Olen, through Crown and United, owned the stock of Second National. Olen was indicted for stock fraud so he arranged through Wolfinbarger to sell the Second National stock to three former stock salesmen of First American-- Withrow, Marine and Niesen-- and thus put paper between himself and Second National, but without actually losing control of the company.
 
 
 18
 Since obviously after November 2, 1968, there is no direct evidence that would support a finding that Crown, United or Olen was a seller or a controlling person, plaintiffs argue that circumstantially the evidence suffices to prove continuing control and that the sale by Crown and United was a device for selling Olen's stock after he was indicted.
 
 
 19
 Preliminarily plaintiffs point out that Withrow, Marine and Niesen did not, at the time of closing the purchase, have sufficient funds to pay the total amount of the purchase price for the stock and subscription rights, and that Withrow had no source of income other than commissions from stock sales. The implication is, of course, that if Olen knew that the stock purchasers were unable to pay him and would engage in false or misleading representations to sell unregistered stock to the public so that the purchasers could pay off the balance owing to Olen with the proceeds of these unlawful sales, then Olen would be liable as a co-conspirator or as an aider and abettor. If we accepted this implication as being supported by evidentiary proof, the case would end in favor of the plaintiffs, because '* * * it is well settled that parties may be liable for violations of the Act and Rule 10b-5 as long as they engage in fraudulent activity 'in connection with' the sale or purchase of securities or in a fraudulent 'course of business." Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 7 Cir. 1969, 410 F.2d 135, at 144. But the record does not support such a conclusion.
 
 
 20
 In Hill York, supra, we had occasion to formulate a test to determine who may be a seller. There we said,
 
 
 21
 'The law is settled that a purchaser may only recover from his immediate seller. Thus if * * * (Withrow, Marine and Niesen) have violated Section 5, the plaintiffs could recover from them. The law is not settled, however, as to who may be a seller. It is clear that a seller is not required to be the person who passes title. * * * This Circuit has implicitly rejected the strict privity concept on at least two prior occasions. Strahan v. Pedroni, 387 F.2d 730 (5th Cir. 1967); Lynn v. Caraway, 252 F.Supp. 858 (W.D.La.1966), aff'd per curiam, 379 F.2d 943 (5th Cir. 1967). Although the term 'seller' has sometimes been accorded a broader construction under Section 12(2) than under Section 12(1), we adopt a test which we believe states a rational and workable standard for imposition of liability under either section. Its base lies between the antiquated 'strict privity' concept and the overbroad 'participation' concept which would hold all those liable who participated in the events leading up to the transaction. See Wonneman v. Stratford Securities Co., Inc., CCH Fed.Sec.L.Rep. P90,923 (S.D.N.Y.1959) and Wonneman v. Stratford Securities Co., Inc., CCH Fed.Sec.L.Rep. P91,034 (S.D.N.Y.1961). We hold that the proper test is the one previously forged by the court in Lennerth v. Mendenhall, (D.C.Ohio, 234 F.Supp. 59) supra. '* * * the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?' 234 F.Supp. at 65. See also Nicewarner v. Bleavins, supra, 244 F.Supp. (261) at 266.'
 
 
 22
 Id. 448 F.2d at 692, 693.
 
 
 23
 Applying this test to the case sub judice, it is manifest that there is no evil under the securities laws in the sale of securities merely because a part of the deferred purchase price is secured by a pledge of the shares sold. There is a critical absence of any showing that at the time of sale or thereafter Olen knew or should have known that the purchasers would violate the securities laws in the sale of the secondary issue, it being undisputed that they sold to the public none of the stock purchased from Olen. Nor can Olen be incriminated because Withrow, one of the three purchasers, had no source of income other than commissions from stock sales with which to pay the deferred installments. There is not an iota of evidence to indicate that this was known to Olen, who met Withrow, Marine and Niesen for the first time when the sale was closed on November 2, 1966. Moreover, it is uncontradicted that the purchasers from time to time loaned money to Diversoco, and that on one occasion Withrow loaned the company $10,000 that he had borrowed in his home town. Apparently his credit during this time was unimpaired.
 
 
 24
 The plaintiffs next contend that, since the purchasers were obligated to pay ten cents per share to United when they exercised their assigned subscription rights to 255,250 shares of Diversoco, Olen was in some manner made liable for whatever fraud the purchasers thereafter perpetrated on the public. Aside from the utter lack of evidence that Olen participated in the purchasers' decision to exercise or not to exercise their assigned subscription rights, Olen agreed at the time of closing on November 2, 1966, that if the purchasers obtained from Diversoco a cancellation of the subscription rights assigned to them by United, the latter in turn would cancel the purchasers' note for $25,520, representing the purchase price for the subscriptions. Such an agreement is antithetical to an intent on Olen's part to bilk the public by the sale of subscription rights, because this arrangement gave his purchasers the right to cancel the entire secondary issue.
 
 
 25
 In an attempt to show a continuing tie-in between Olen and the purchasers the plaintiffs point to the fact that on occasion the installment payments due to Crown and United from the purchasers were paid by checks drawn on the account of Diversoco, Inc., thus imparting knowledge to Olen, it is argued, that the source of the money paid to him was either from commissions owed to the purchasers for the sale of Diversoco stock or from funds borrowed by the purchasers from the company's treasury. Even if Olen were to have guessed that the source of the payments to him was commission money or borrowings from the company by the purchasers, there was no showing that this was wrongful or unlawful. In fact, most of the installment payments by the purchasers to Crown and United were made by personal checks. The three checks drawn on Diversoco for payments of $1,000.00, $542.00 and $546.36 respectively were each charged back to the personal account of the drawer on the books of the company to offset accounts already due or to become due to the drawer of the check. This argument is devoid of merit.
 
 
 26
 Next, plaintiffs submit that the defendants were controlling persons within the meaning of 15 U.S.C.A. 77o (1971) (Section 15) which reads:
 
 77o. Liability of controlling persons
 
 27
 Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.
 
 
 28
 If Withrow, Marine and Niesen violated Section 5 and the defendants 'controlled' them, then the defendants are liable under Section 12(1). As we have noted, there is no doubt about the violations occurring after November 2, 1966, for which the three purchasers were responsible.
 
 
 29
 The statute is broadly stated to include control by stock ownership, agency or otherwise, and the SEC further defines 'control' in Rule 405 as follows:
 
 
 30
 '(f) Control. The term 'control' (including the terms 'controlling,' 'controlled by,' and 'under common control with') means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. 17 C.F.R. 231, 405(b) (1971).'
 
 
 31
 The plaintiffs urge that, because of the default provisions contained in the escrow agreement, continued control was vested in the sellers. Bearing in mind that the plaintiffs had the burden of establishing control, Hill York, supra, at 694, we summarily dismiss this argument as being without merit. We are unwilling to extend the definition of 'controlling person' to a situation where, as here, stock is simply pledged as security for deferred payments, and particularly where the reinstatement provision after default is so favorable to the purchaser.
 
 
 32
 As a further indication that Olen and his corporations continued to be controlling persons, the plaintiffs offered evidence that on May 20, 1968 (a year and a half after the sale of Second National), Withrow, acting for Diversoco, purchased for $5,665.00 investment letter stock of Atlantic National Corporation, which was owned by Overseas Commercial Company, Ltd. and controlled by Olen; but there is nothing in the record to show that this purchase was anything but an arm's-length transaction, the consideration for which is not challenged. Furthermore, the purchase was made by Diversoco so that the Atlantic National stock, together with stock of Diversoco owned by Withrow and Marine, could be tendered to two Diversoco stockholders, Witcher and Clark, to satisfy a note of $20,000 given by Second National to those stockholders in May of 1966 for the purchase from them of Budget Finance Co. stock. There is no suggestion of a violation of the securities acts in the purchase of Budget Finance by Second National in 1966 in exchange for stock in Second National and the issuance by the latter of the promissory note that was satisfied by the 1968 transaction.
 
 
 33
 We conclude that the plaintiffs wholly failed to prove that Crown, United or Olen were controlling persons within the purview of the Act.
 
 
 34
 Finally, the plaintiffs assert that, prior to the sales agreement of November 2, 1966, Second National engaged in a public offering by its prospectus of July 15, 1966, and failed to disclose either that it was losing money or that the sale of its unregistered stock violated the securities laws. We are unpersuaded that there was a material omission in the prospectus. It correctly showed that the corporation had been recently formed and that its total earnings were $597.08; that the company had no business but sought capital for business which it would endeavor to engage in at a future time. The prospectus proclaimed that there was no established market for Second National stock, the price for which was stated as having been arbitrarily set by the company and not based on earnings; that the offering was speculative and that there were no representations that the stock could be resold for the offering price of one dollar per share.
 
 
 35
 The evidence is clear that the acquisition of the original issue of Second National stock by Crown, a Florida corporation, and the Alabama stockholders was nothing more than organizational stock. The sale of stock to the promoters of Second National was a private offering which was exempt from the registration requirements of Section 77e within the meaning of Section 77d(2). See SEC v. Ralston Purina Co., 1953, 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494; SEC Release No. 4552. The fact that Crown was a non-resident incorporator is irrelevant under Section 77d(2). Furthermore, the sales of stock to twenty-six Alabama residents after the July 15, 1966, prospectus and prior to November 2, 1966, did not require registration under the Securities Act because no 'means or instruments of transportation or communication in interstate commerce or of the mails' were used to sell the stock.[10] In any event, at Olen's insistence his purchasers were required to, and did give, every stockholder who purchased stock in Second National prior to November 2, 1966, the opportunity at that time to resell his stock and any subscription rights for the original purchase price. This requirement imposed by Olen was patently inconsistent with any intent on his part to defraud the stockholders who had purchased shares in the company at a time when he was admittedly in control.
 
 
 36
 Olen disclaimed any connection, directly or indirectly, with Diversoco after the sale of stock by Crown and United on November 2, 1966. It is undisputed that he never visited the offices of Diversoco either in Mobile or Birmingham; he had nothing to do with the preparation or publication of the prospectus of November 2, 1966, and September 30, 1967; he participated in no way in the sale of the primary and secondary issues of Diversoco stock; he had no right to and did not manage or direct the company; he had no connection with the purchase of First American Life stock by Diversoco; he had no right to vote and in fact did not vote the stock sold by Crown and United to Withrow, Marine and Niesen which was held in escrow. Crown and United made no profit on the 244, 750 shares sold by them on November 2, 1966, and this stock was never sold to the public. Finally, it appears that the directors who served on the Diversoco board after November 2, 1966 (except Withrow, Marine and Niesen), and who were called as witnesses for the plaintiffs, were unacquainted with Olen and were certain that he had nothing to do with the affairs of the company.
 
 
 37
 We must be guided by the 'familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes,' Tcherepnin v. Knight, 1967, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564; Herpich v. Wallace, 5 Cir. 1970, 430 F.2d 792, 800, but we decline to permit blame to be based solely on conjecture in the guise of inference. Moore v. Chesapeake & Ohio Ry., 1951, 340 U.S. 573, 71 S.Ct. 428, 95 L.Ed. 547. Considering all of the evidence, together with all reasonable inferences most favorable to the plaintiffs, the facts and inferences here point so strongly and overwhelmingly in favor of the defendants that reasonable men could not have arrived at a contrary verdict; thus defendants' motion for a directed verdict should have been granted. Boeing Co. v. Shipman, 5 Cir. 1969, 411 F.2d 365.
 
 
 38
 The judgment of the district court is reversed and judgment is rendered for Crown Services Corporation, a Florida corporation, United Services Association of Alabama, Inc., an Alabama corporation, and Maurice Olen.
 
 
 39
 Reversed and rendered.
 
 
 
 [1]
 The federal and state securities acts relied on by the plaintiffs are the anti-fraud provisions of Section 10(b) and SEC Rule 10b-5, Securities Exchange Act of 1934, 15 U.S.C.A. 78j(b); Sections 12(2) and 17, Securities Act of 1933, 15 U.S.C.A. 77l(2) and 77q; Section 18 of the Securities Act of Alabama, Title 53, Code of Alabama 45; and the provision proscribing the sale of unregistered securities, Section 5, Securities Act of 1933, 15 U.S.C.A. 77e
 
 
 [2]
 Defendants Wolfinbarger and Insurance Capital Corporation failed to appear and defend the action. In accordance with the jury's verdicts, final judgments were entered against each of them. Neither defendant appealed
 After suit was instituted a settlement was effected with defendant Withrow, Marine, Niesen, Liddell, Price, Aderholt, Wyatt, Tucker, Simmons and Diversoco, Inc., and they were dismissed with prejudice. Diversoco, Inc. was realigned as a plaintiff.
 
 
 [3]
 Not included were stockholders Witcher and Clark, who had received 10,000 shares of Second National in exchange for the stock of Budget Finance, which they owned, and which transaction occurred prior to the July 15, 1966, prospectus
 
 
 [4]
 Much of this stock was sold to 'advisory directors' on the basis of one dollar per share and the gift of one share, which thus averaged the cost to fifty cents per share. The advisory directors had no duties or responsibilities
 
 
 [5]
 Section 15 of the Securities Act of 1933, 15 U.S.C.A. 77o
 
 
 [6]
 Section 12(1) of the Securities Act of 1933, 15 U.S.C.A. 77l(1)
 
 
 [7]
 Section 12 of the Securities Act of 1933, 15 U.S.C.A. 77l(2)
 
 
 [8]
 Section 5 of the Securities Act of 1933, 15 U.S.C.A. 77e
 
 
 [9]
 Section 17 of the Securities Act of 1933, 15 U.S.C.A. 77q; Section 10 of the Securities Exchange Act of 1934, 15 U.S.C.A. 78j(b); SEC Rule 10b-5
 
 
 [10]
 Section 5 of the Securities Act of 1933, 15 U.S.C.A. 77e(a)(1)