Dan J. CROY and Anne S. Croy, Plaintiffs-Appellants,

v.

Winfield M. CAMPBELL, Defendant-Appellee.

No. 78–2517.

United States Court of Appeals, Fifth Circuit.

Aug. 22, 1980.

---

Jack McClendon, Lubbock, Tex., for plaintiffs-appellants.

Baker & Botts, Stephen G. Tipps, Daryl Bristow, Houston, Tex., for defendant-appellee.

Before RUBIN and POLITZ, Circuit Judges, and SMITH *, District Judge.

ORMA R. SMITH, District Judge:

This action was brought by Dr. Dan Croy and his·wife, Anne S. Croy (the Croys), who alleged that the defendant Winfield M. Campbell (Campbell), violated § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. After the presentation of the plaintiffs' evidence on the issue of liability, the district court granted judgment for the defendant. Plaintiffs now appeal from that judgment, contending that the district court made several errors in its findings of fact and conclusions of law. For the reasons stated below, we hold that the court's findings of fact were not clearly erroneous, and that the court applied proper legal standards in reaching its conclusions of law.[1]

---

\* District Judge of the Northern District of Mississippi, sitting by designation.

1. Under Rule 52(a), Fed.R.Civ.P., the trial court's "findings of fact shall not be set aside unless clearly erroneous." Our standard for determining whether or not the findings are clearly erroneous has been stated on numerous occasions. A district court's findings are clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746,

The record reveals that for several years prior to 1974, the Croys had become increasingly concerned about the large amounts of income tax which they were paying. Their income had risen considerably due to some inheritance by Mrs. Croy, and their concern over the amount of tax which they were paying prompted plaintiffs to seek some tax planning advice. On February 15, 1974, they met with the defendant Campbell, who had been recommended to them by a friend. Campbell is a practicing attorney and a licensed certified public accountant, and at the time he first met the Croys, he had been practicing law for three years. He was recommended to them as being experienced in real estate and tax matters. After the initial meeting with the Croys, and after they had other opportunities to discuss proposed investments, Campbell arranged for the Croys to meet with Irby Simpkins, a real estate developer whom Campbell had represented on previous occasions.[2] Mr. Simpkins was the general partner in a limited partnership which managed the Chateaux Dijon, an apartment complex in Metairie, Louisiana. Campbell had told the Croys during one of their preliminary meetings that this particular project was "the best investment so far as tax shelter was concerned" that he had ever seen. Simpkins gave Campbell a sales brochure which contained certain financial information about the project. Campbell did not prepare any of the information in that brochure, but he used it to make certain estimates and projections as to the Croys' potential tax liability. He reviewed this brochure with them, and also informed them about the method by which he calculated future depreciation. He also advised them to make an independent business judgment about the advisability of an investment in the partnership.

As of their initial meeting in February, Campbell considered himself to be the Croys' attorney. The Croys were of the opinion that the relationship was not established until approximately one month later. Regardless of the specific date, however, there is evidence which indicates that Campbell's fee for representing the Croys was to be paid by Simpkins. Dr. Croy testified that he did not learn of this fee arrangement until much later, after the Croys had invested in the project, and that he discovered that Campbell's fee was contingent upon their decision to invest. Campbell testified that there was no contingency arrangement, and that he disclosed the fee agreement to the Croys before they purchased the interest in the Chateaux Dijon.

On April 1, 1974, the Croys obtained a 60-day option to purchase a 72.17% interest in the limited partnership. The consideration for the option was $60,000, which was nonrefundable, and the total consideration for the interest was to be $502,000. On April 15, 1974, Campbell received a tax return for the Chateaux Dijon, a review of which revealed that the depreciable basis which he had previously calculated was in error. Campbell had never made an independent investigation of the projected depreciable basis, but had only utilized those figures given to him. Upon discovering this new information, he informed Simpkins that the transaction would not be complet-

---

766 (1948). *See also, Ealy v. Littlejohn*, 569 F.2d 219, 229 n. 30 (5th Cir. 1978); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2585 at 731 (1971). The language of the test itself allows this court to review all of the evidence in the record, even though we must give "great weight to the findings made and the inferences drawn by the trial judge." C. Wright & A. Miller, *supra*. *See also Lentz v. Metropolitan Life Ins. Co.*, 428 F.2d 36, 39 (5th Cir. 1970).

Our review of the district court's conclusions of law is not limited by the standard of Rule 52; such conclusions will be reversed if incorrect.

The appellants contend that, as to every issue presented for review, the trial court "erred". The appellees contend that the trial court was not "clearly erroneous" as to these issues. While the findings of fact are to be reviewed under this standard, our analysis does not end there, for some of the issues presented naturally involve mixed questions of law and fact, since they involve the application of legal principles to the specific facts of this case.

2. Mr. Simpkins was originally a defendant in this action, but all claims against him were dismissed by reason of settlement.

ed, and that the Croys were entitled to a refund of their $60,000. He then contacted Dr. Croy, informing him of the decrease in the depreciable basis, and also telling him that the Croys could get their money back. He told Dr. Croy that he thought the transaction could be renegotiated. Dr. Croy testified that Campbell told him that he had thought of a way in which the Croys could "stay in the deal which . . . is even better that the original deal." Dr. Croy instructed Campbell to proceed with the negotiations, and on May 27, 1974, the Croys became limited partners in the Chateaux Dijon. In December, 1974, the Croys purchased from Simpkins his 19.14% general partnership interest. The other interest remained in the hands of the other initial limited partners.

The plaintiffs filed their complaint in this action on July 14, 1975, alleging that the defendant had violated § 12(2) of the Securities Act by selling a security by means of a prospectus which contained certain misrepresentations,[3] and that the defendant had violated § 10(b) and Rule 10b–5, which are the general antifraud provisions of the Securities Exchange Act.[4] As previously stated, the district court granted judgment for the defendant at the conclusion of the plaintiffs' case. The court found that Campbell was not a "seller" of the security for the purposes of § 12(2), that he made no misstatements or omissions of material fact,

and that the Croys were estopped by their own conduct from asserting that Campbell should have conducted a more thorough investigation of the project. It is these three findings which the Croys now contend are in error, and to which the court will address itself.

## I.

■ Section 12(2) of the Securities Act imposes liability on one who "offers or sells" a security by means of a prospectus which contains material misstatements or omits material facts. In order for Campbell to be liable under this section, therefore, he must be a seller of the security. To define the scope of the term "seller", however, the court should look to the purpose of the Securities Act, which is to ensure that potential investors are provided with all material information concerning public offerings of securities. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 195, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668, 678 (1976). The Act attempts to provide for the "unrestricted flow of information and funds," *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 357 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), and in order to accomplish that purpose the statutory scheme places disclosure requirements on those with access to relevant information.

3. Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), provides as follows:

> Any person who . . .
>> (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communications, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

> shall be liable to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.

4. In a memorandum opinion denying the defendant's motions to dismiss and for summary judgment, the district court held that the plaintiffs' purchase of the limited partnership interest was the purchase of a security, in that the plaintiffs were passive investors who never intended to manage or participate in the operation of the Chateaux Dijon. The court also held that the plaintiffs had not satisfied the "tender" requirement of § 12(2), but that tender could be made in the pleadings. Plaintiffs were given leave to amend their complaint to satisfy the tender requirement.

■ Considering the broad construction which should be given to the Act in order to effectuate its remedial purpose, this Court has held that one need not be in "strict privity" with the purchaser, nor is one required to be the "person who passes title" in order to be a seller of the security under § 12(2). *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 692 (5th Cir. 1971). In *Hill York*, this court held that where the defendants, who were the promoters of a nationwide franchise operation, "were the motivating force behind [the] whole project," 448 F.2d at 693, they should be held liable as sellers under § 12. The court held that the proper test to be applied was one of proximate cause:

the line of demarcation must be drawn in terms of cause and effect: To borrow a phrase from the law of negligence, did the injury to the plaintiff flow directly and proximately from the actions of this particular defendant?

448 F.2d at 693, *quoting Lennerth v. Mendenhall*, 234 F.Supp. 59, 65 (N.D.Ohio 1964).[5]

In the particular fact situation presented by *Hill York*, the following factors persuaded the court that the defendants proximately caused the plaintiff's injury:

The [defendants] sought out the original incorporators of Florida Franchise and then trained them to solicit additional capital for the corporation. They provided the sales brochures designed to secure the additional capital. They rendered advice on every aspect of the corporate formation and subsequent development. In fact, the defendants did everything but effectuate the actual sale.

448 F.2d at 693. See also, *Lewis v. Walston & Co., Inc.*, 487 F.2d 617, 621–22 (5th Cir. 1973), where the court reaffirmed the principle established in *Hill York*, that one need not be in privity with the purchaser to be liable as a seller. In that case, the defendant was a registered broker's representative who "touted the . . . stock heavily to the plaintiffs", and arranged the initial meeting at which the stock was sold. The court held that, in view of these established facts, the jury could have reasonably inferred that the defendant was a "substantial factor" in causing the purchases. 487 F.2d at 622.

This court has only recently addressed the question of liability under section 12(2), in a case involving substantially different facts. In *Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980) the court held that a reading of *Hill*

---

5. The court emphasized that the test was intended as a middle ground between the concept of privity, and the concept of "participation . . . which would hold all those liable who participated in the events leading up to the transaction." 448 F.2d at 692, *citing Wonneman v. Stratford Securities Co., Inc.*, CCH Fed. Sec.L.Rep. ¶ 91,034 (S.D.N.Y. 1961); *Wonneman v. Stratford Securities Co., Inc.*, CCH Fed. Sec.L.Rep. ¶ 90,923 (S.D.N.Y. 1959). Other courts have not framed the issue in terms of causation, but have continued to regard the concept of privity as the "general rule". *See, e. g., Turner v. First Wisconsin Mortgage Trust*, 454 F.Supp. 899, 912 (E.D.Wis. 1978) (cause of action under § 12(2) arises "only against a purchaser's immediate seller"); *Collins v. Signetics Corp.*, 443 F.Supp. 552, 555 (E.D.Pa. 1977) (absence of privity is "fatal" to plaintiff's claim absent special relationship between parties); *Lorber v. Beebe*, 407 F.Supp. 279, 287 (S.D.N.Y. 1975) (general rule limits action to purchaser's immediate seller); *DuPont v. Wyly*, 61 F.R.D. 615, 625–27 (D.Del. 1973) (language of § 12(2) explicitly requires buyer-seller relationship). *See also, B & B Investment Club v. Kleinert's Inc.*, 391 F.Supp. 720, 725–26 (E.D.Pa. 1975). Exceptions to this general rule have been recognized, "and liability has attached to persons acting as the immediate seller's agent, to defendants who are alleged to be controlling persons of the immediate seller, and to those who have actively participated in the fraudulent sale, either as an aider and abettor or as a coconspirator." *deBruin v. Andromeda Broadcasting Systems*, 465 F.Supp. 1276, 1280 (D.Nev. 1979). *See also, Brick v. Dominion Mortgage and Realty Trust*, 442 F.Supp. 283, 292 (W.D.N.Y. 1977); *Stern v. American Bankshares Corp.*, 429 F.Supp. 818 (E.D.Wis. 1977); *Sandusky Land, Ltd. v. Uniplan Groups, Inc.*, 400 F.Supp. 440, 444 (N.D.Ohio 1975); *In re Ceasars Palace Securities Litigation*, 360 F.Supp. 366, 378 (S.D.N.Y. 1973). Many of these decisions impose liability on the basis of the "control" provision of § 15, 15 U.S.C. § 77o, but other courts have simply extended the language of § 12 itself to include aiders, abettors, and controlling persons as sellers. This court is of the opinion, however, that a causation test is better suited to apply the purpose of the Act to a particular fact situation; it is, as we have stated, a "rational and workable standard." *Hill York*, 448 F.2d at 692.

*York* and *Lewis* limit limits sellers under section 12

> (i) to those in privity with the purchaser and (ii) to those whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place. Mere participation in the events leading up to the transaction is not enough.

621 F.2d at 667. Participation in the sale of a security, therefore, is an important factor only as it relates to the concept of causation. A determination that one has participated in the transaction should not be conclusive as to the participant's liability as a seller, but it may be a criterion in determining whether or not the defendant "caus[ed] the transaction to take place." *Id.* *See also, In re Ceasars Securities Litigation,* 360 F.Supp. 366, 377–82 (S.D.N.Y. 1973).[6]

In this case, the district court made the following findings relevant to Campbell's participation in the sale: (1) Campbell made no representations "concerning any of the operational or construction aspects of the project," and he had "nothing to do with the preparation of the brochure"; (2) he did deliver the brochure to the Croys, but in doing so, he was acting on their behalf, not on behalf of Simpkins; (3) he did not attempt to persuade the Croys that they should purchase the Chateaux Dijon; (4) the statement which he did make, referring to the project as the "best investment" he had ever seen, referred only to the beneficial tax results which he thought would be obtained, based upon the figures he had seen; (5) the plaintiffs made a decision to invest in the project, only after viewing the project itself, talking with Simpkins, and obtaining independent advice. Examining all of the evidence in the record, we hold that these findings are not clearly erroneous. Applying these findings to the "seller" concept, as we have defined it, we cannot say that the defendant's participation in this transaction proximately caused the plaintiffs' injury, or that they would not have purchased the security "but for" his actions. The injury was caused by the fact that the figures used by Campbell in arriving at the depreciable basis were in error. Plaintiffs contend that he should be held liable for his failure to investigate these matters thoroughly. This failure to investigate, however, was not a substantial factor in the Croys' investment decision, and Campbell cannot, therefore, be held liable under section 12(2) as a seller of the security. This conclusion should not be interpreted to mean that a lawyer who participates in the transaction can never be a seller for purposes of section 12. Each case naturally turns upon its own facts, and our decision in this case is based upon the facts as found by the district court. The standard which we apply focuses upon the actions of a particular defendant, regardless of his occupation, and upon the proximate cause of the plaintiff's injury. *See* note 5 and accompanying text, *supra.*

## II.

The Croys next contend that the district court erred in finding that Campbell did not make any material misstatements or omissions, and that the projections and estimates which he made were not without a reasonable basis in fact. The Croys argue that Campbell's failure to determine, by investigation, the correct financial status of

---

**6.** Those cases which have applied the causation test of *Hill York* and *Lewis* have achieved varied results, but the courts have utilized similar factors. *E. g., Ayers v. Wolfinbarger,* 491 F.2d 8, 13 (5th Cir. 1974) (one who sold stock to a person who then violated the securities laws was not a seller of the security in the secondary sale); *Plunkett v. Francisco,* 430 F.Supp. 235, 241 (N.D.Ga. 1977) (action of defendant who was one of corporation's owners and also signed warranty letter was proximate cause of injury; *Wassel v. Eglowsky,* 399 F.Supp. 1330, 1361 (D.Md. 1975) (defendants who informed plaintiff that stock would soon be available and would increase in value, and who obtained stock for sale to plaintiff, were sellers who proximately caused injury); *Canizaro v. Kohlymeyer & Co.,* 370 F.Supp. 282, 287 (E.D.La. 1974) (broker who acted as plaintiff's agent in executing a purchase order, and neither solicited order nor recommended stock was not proximate cause of injury). *Cf. Wasson v. SEC,* 558 F.2d 879, 885–86 (8th Cir. 1977) (Fifth Circuit's test of causation does not focus upon disclosure policies of the Act).

the project, and his failure to disclose the fee arrangement, constitute material omissions for which he should be liable under § 12(2) of the Securities Act, and § 10(b) of the Securities Exchange Act. The elements of a cause of action under § 10(b) and Rule 10b–5 have previously been stated by this court. The plaintiff must prove:

A misrepresentation or omission or other fraudulent device, the plaintiff's purchase or sale of securities in connection with the fraudulent device, the materiality of the misrepresentation or omission, the defendant's scienter in making the misrepresentation or omission, the plaintiff's justifiable reliance on the device (or due diligence against it), and the plaintiff's damages resulting from the fraudulent device.

*Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193–94 (5th Cir. 1979), *aff'd in part, vacated and remanded in part on rehearing*, 611 F.2d 105 (5th Cir. 1980), *citing Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *Woodward v. Metro Bank*, 522 F.2d 84, 93 (5th Cir. 1975).

In *Ernst & Ernst v. Hochfelder*, the Supreme Court defined the requisite state of mind, or scienter, as "a mental state embracing intent to deceive, manipulate, or defraud." 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12, 47 L.Ed.2d at 677 n. 12. The court held that negligence will not suffice for the imposition of liability under 10b–5, but it specifically withheld consideration of whether or not reckless behavior was sufficient. This court has recently made clear what it had intimated in the past: that "[t]o sustain a cause of action under [rule] 10b–5, . . . plaintiffs must show that defendants intentionally *or recklessly* failed to disclose material information." *Broad v. Rockwell International Corp.*, 614 F.2d 418, 440 (5th Cir. 1980) (emphasis added). The court also noted, however, that proof of recklessness would require a showing that the defendant's conduct was

an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

614 F.2d at 440, *quoting Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977).

█ The district court found that Campbell did not make any material misrepresentations or omissions, and that he could not have discovered the existence of any such misrepresentations or omissions through the exercise of reasonable care. The Croys contend that, while they made no showing at the trial directed specifically toward the defendant's state of mind, the evidence which was presented makes an implicit showing of reckless behavior. They contend that Campbell never viewed the project, did not look at Simpkins' books, and knew before the transaction occurred that the project had a lower depreciable basis than his original estimate. The Croys urge this court to hold that, combined with Campbell's position as an attorney, his failure to make a financial investigation demonstrated recklessness. We cannot say, however, that the court's findings were clearly erroneous. The mere fact that Campbell made a tax analysis based upon the information presented to him, was not an "extreme departure from the standards of ordinary care." Nor can we say that the representations made were not without a reasonable basis in fact. *See Ferland v. Orange Groves of Florida, Inc.*, 377 F.Supp. 690, 705 (M.D.Fla. 1974).

█ The court below found that not only did Campbell inform the Croys that the brochures contained estimates only, but he also told them that they should make an independent investigation, since he was not qualified to appraise real property. Our review of the record clearly reveals that Campbell made his analysis by using his own estimates rather than those in the brochure, which he considered to overstate the expected revenue. This evidence indicates that Campbell did not make any misleading statements, nor did he fail to disclose any material information to the Croys. As to the alleged omission concerning the attor-

ney's fee, we think the evidence is sufficient to support the district court's finding that the Croys knew of the arrangement. Even if such an arrangement is considered to be a material fact, the district court found that Campbell informed the Croys. The existence of this fee agreement, as well as Campbell's failure to investigate the project thoroughly, might reflect on his conduct as an attorney, but such conduct standing alone, is not "manipulative or deceptive" within the meaning of the rule.[7] The evidence supports the court's finding that Campbell made no misrepresentations or omissions, and that his conduct was neither intentional nor reckless.

### III.

The Croys' final contention is that the district court erred in finding that they were estopped by their own conduct from asserting that Campbell should have conducted a more thorough investigation or should have learned more about the project. Under § 12(2), one who offers or sells the security is liable only if he does not "sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of [the] untruth or omission." As we have recently stated, this statutory defense would seem to save sec-

tion 12(2) from being interpreted solely as a strict liability statute. *Pharo v. Smith*, 421 F.2d at 665 n. 6. The burden of proof here is on the defendant, and there is nothing in the statute relating to estoppel as a defense. The concept has been applied to actions under 10b–5, *see Hecht v. Harris Upham & Co.*, 430 F.2d 1202 (9th Cir. 1970), and this court has recognized "due diligence" as an element of a cause of action under 10b–5. *Dupuy v. Dupuy*, 551 F.2d at 1014. Such an element is required because "only those who have pursued their own interests with care and good faith should qualify for the judicially created private 10b–5 remedies." 551 F.2d at 1014. To the extent that a plaintiff has not exercised due diligence, he is in one sense estopped to assert liability on the part of the defendant. However, because the district court found that the defendant was not a seller within the meaning of § 12(2), which finding we hold is not clearly erroneous, we need not discuss the application of estoppel principles to that section. Similarly, because we do not disturb the district court's finding that defendant made no misrepresentations or omissions, and his conduct was not reckless, we do not think it necessary to discuss the application of estoppel and due diligence under Rule 10b–5. The judgment of the district court is, therefore, AFFIRMED.

---

**7.** We wish to emphasize that this is a securities action; we are not concerned with any allegations of attorney malpractice, for such issues are not before us. The plaintiffs' second amended complaint included two pendent state law claims: one alleging a violation of the Texas Blue Sky Statute; the other alleging fraudulent and false representations with respect to the sale of real estate. These claims have not been pursued, and are not before us on appeal. The complaint does not include any counts alleging negligence or malpractice on the part of the defendant.

In alleging that the defendant practiced "deceit" within the meaning of Rule 10b–5, the plaintiffs contend that Campbell's conduct violated the fiduciary relationship between attorney and client, by his refusal to make a full disclosure of the fee arrangement. They contend that his duty to disclose is established by the law of Texas relating to the attorney-client relationship, and that such law is relevant to the imposition of liability under 10b–5. The court would merely point out that the term "fraud" as used in 10b–5 does not include all

breaches of fiduciary duty in connection with the purchase or sale of securities. In *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480, 493 (1977), the Supreme Court made it clear that a breach of fiduciary duty, without proof of deception, misrepresentation, or nondisclosure, was not a violation of 10b–5. To hold otherwise, said the Court, would be to "federalize" state rules of law dealing with fiduciary relationships, a result which Congress did not intend. 430 U.S. at 479, 97 S.Ct. at 1304, 51 L.Ed.2d at 495–96. *See also, Alabama Farm Bureau Mut. Cas. Co. v. American Fidelity Life Ins. Co.*, 606 F.2d 602, 613–14 (5th Cir. 1979), in which this court held that where deception or manipulation is present, the court would then determine whether or not state law provided a remedy for breach of fiduciary duty. Since we affirm the district court holding that Campbell did not practice any deception or misrepresentation, and since there is no separate state law claim before us, we need not discuss Campbell's conduct as an attorney.