J. Don FOSTER, an individual,
Plaintiff-Appellee,

v.

JESUP AND LAMONT SECURITIES CO., INC., a corporation,
Defendant-Appellant, Cross-Appellee.

J. Don FOSTER, an individual,
Plaintiff-Appellant,
Cross-Appellee,

v.

TEXAS PARTNERS '80 LTD., a limited partnership, Minnick Resources Management, Inc., a corporation, F. Wendell Minnick, an individual, Jesup and Lamont Securities Co., Inc., a corporation, and Pyron Exploration and Drilling Corp., a corporation, Defendants-Appellees, Cross-Appellants.

Nos. 83–7573, 84–7255.

United States Court of Appeals,
Eleventh Circuit.

May 6, 1985.

John L. Schaub, John L. Taylor, Jr., Atlanta, Ga., William H. Hardie, Jr., Mobile, Ala., for defendant-appellant, cross-appellee Jesup and Lamont Securities Co., Inc.

W. Ramsey McKinney, Jr., Mobile, Ala., for J.D. Foster.

Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

This securities case requires us to consider what conduct makes one a "seller" within the meaning of § 12(2) of the Securities Act of 1933.[1] Because we conclude that appellant was not a "seller" of the securities in question, we reverse the district court's judgment with respect to appellee's § 12(2) claim. Appellant has also been found liable under Alabama securities laws. We conclude that the legal sufficiency of these latter claims depends on important questions of state law that have not been ruled upon by the courts of Alabama. Accordingly, we certify these questions to the Alabama Supreme Court for instruction.

*Facts*

Foster, plaintiff below, invested in a Texas limited partnership in December, 1980 (Texas Partners '80, Ltd., hereafter "Texas Partners"). Texas Partners' ostensible business purpose was to develop oil and gas wells. In fact, no substantial drilling operations were undertaken on behalf of the partnership, and Foster lost the amount he invested.

Foster bought his interest from Minnick, sole shareholder and president of Minnick Resources Management, Inc., which was the general partner in Texas Partners.[2] The only party involved with Texas Partners that defended before the district court and the only party opposing Foster before this court is Jesup & Lamont Securities Co. ("Jesup & Lamont"), a New York securities dealer whose name appeared on the Texas Partners offering document.

Jesup & Lamont first became involved in the offering in June of 1980 when its president, Curd, and its vice-president, Thors, met with Minnick to discuss the firm's participation. Minnick and Jesup & Lamont subsequently entered into an agency agreement whereby the firm promised to use its "best efforts" to sell interests in Texas Partners. Jesup & Lamont was to receive a ten percent commission for interests it sold, and a two percent commission for interests sold by Minnick. Jesup & Lamont was not required by the agreement to sell any interests, but only to use its best efforts in that regard.

Following the initial meeting with Minnick, Curd inquired of Minnick's former employers and of his banker about Minnick's standing in the investment community. These references were favorable, and reported that Minnick "had a reputation of being successful in oil and gas." 4 Rec. at 347. Jesup & Lamont did not investigate other particulars about Minnick, such as how he had fared in specific oil and gas deals or his standing with trade creditors. Jesup & Lamont also did not investigate the particulars of the Texas Partners un-

---

* Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation.

1. 15 U.S.C.A. § 77*l* (2) (West 1981).

2. The actual drilling operations contemplated were to have been undertaken by Pyron Exploration and Drilling Corp., another Texas entity in which Minnick was involved. Each of the four—Texas Partners '80, Ltd.; Minnick; Minnick Resources Management, Inc.; and Pyron Exploration and Drilling Corp.—were named as defendants in Foster's securities action in the district court. None of the four filed responsive pleadings, and default judgments were entered against them. All four filed notices of appeal, but their appeals were subsequently dismissed for want of prosecution.

dertaking, such as the status of the partnership's leases or the financial feasibility of the planned drilling operations.

The Texas Partners venture went forward and an offering memorandum was prepared for use in the sale of interests in the partnership. Minnick testified by deposition that he drafted the offering memorandum, but that it was reviewed by a lawyer at Shea & Gould, a New York law firm that represented Minnick in the proposed offering. Shea & Gould was also general counsel to Jesup & Lamont. Jesup & Lamont had no role in the drafting or printing of the offering memorandum, the cost of which was borne by Minnick. Three hundred copies were printed and delivered to Minnick, who sent thirty copies to Jesup & Lamont.

The offering memorandum comprises sixty pages of text and nine exhibits. The cover of the memorandum displays the limited partnership's name at the top and Jesup & Lamont's name, address, and phone number at the bottom, with the notation that the firm is a member of the New York Stock Exchange.[3] The same general information about Jesup & Lamont is presented on the first inside page and a legend appears in two places early in the document stating that "These Limited Partnership Interests are being primarily distributed through Jesup & Lamont Securities Co., Inc." Pl.Ex. 1. In the text of the offering memorandum is the information that Texas Partners and Jesup & Lamont had entered into a best efforts selling arrangement, and that "In addition, other persons may receive commissions for selling Interests, including Minnick Resources Management, Inc." *Id.* at 4. The offering memorandum is dated July 30, 1980.

Jesup & Lamont and Minnick rescinded their sales agency agreement shortly after this date.[4] In his deposition, Minnick testified that he had been unhappy with Jesup & Lamont's performance. At trial, Curd

testified that Jesup & Lamont had decided "the item was basically not marketable." 4 Rec. at 348. Although the principals agreed to rescind the best efforts agreement, they disagreed about who should pay for the offering documents. Minnick wanted Jesup & Lamont to pay the printing costs because the firm's lack of success had resulted in rescission of the agreement. Jesup & Lamont took the position that it had no responsibility to pay because the agreement only required "best efforts," which the firm felt it had given. There is no dispute in the record that Minnick told Curd he was going to remove Jesup & Lamont's name from the document. Minnick testified he attempted to do so for several offering documents by using scissors to cut out at least some of the references to Jesup & Lamont. Jesup & Lamont did not attempt to have Minnick surrender to the firm the offering documents in his possession.

Foster was first introduced to Texas Partners by his accountant, Jordan, who had met Minnick in May of 1980. Jordan testified by deposition that he traveled to New York in November of 1980 on business not related to Texas Partners, but which involved Jesup & Lamont. Jordan took advantage of this opportunity to question Curd about Minnick's prior activities. Curd reassured him about Minnick even though, unknown to Jordan, Jesup & Lamont had already withdrawn from the Texas Partners offering. Jordan testified that at the November meeting, Curd told him "We are involved in this offering document and we know of nothing that would effect [sic] our relationship with Mr. Minnick." 3 Rec. at 195. At trial, Curd denied the occurrence of the meeting at which this statement allegedly was made.

Minnick and Foster were brought together for the first time by Jordan at a meeting attended by the three in Jordan's Alabama office in late December of 1980. The meeting lasted for one to two hours and focused

---

3. See Exhibit A to this opinion.

4. The record does not fix the date of rescission precisely, but Curd testified that the agreement

was to expire on August 30, which was "right around this time [i.e. the time of rescission]." 4 Rec. at 349.

on Foster's possible purchase of an interest in Texas Partners. Foster questioned Minnick about his background and about the particulars of the undertaking. Minnick made representations about the amount of money that had already been raised by Texas Partners, and told Foster that the money was to be used in drilling numerous wells. Foster was given a copy of the offering memorandum, which bore Jesup & Lamont's name. He testified he studied the document after the meeting and relied on it in eventually deciding to buy one-half ·of an interest in Texas Partners. Foster did not communicate directly with anyone at Jesup & Lamont before he invested in Texas Partners.

The specific representations in the offering memorandum Foster said he relied on that later proved false were: (1) that Jesup & Lamont was involved in the offering; (2) that the proceeds of the offering would be used by Texas Partners in development drilling for oil and gas; (3) that the general partner, Minnick Resources Management, Inc., would contribute five percent of the drilling costs; and (4) that investments would be refunded if a minimum amount were not raised.

Jordan's association with Minnick continued after Foster's purchase. Jordan learned from work he did for the drilling company, Pyron Exploration and Drilling Corp., that Texas Partners had not raised the required minimum in investments. Further, Jordan discovered that the money raised by Texas Partners had not been applied to development drilling as promised. When Jordan notified Foster of these facts, Foster called Minnick, who assured him that the money he had invested would be refunded. When Minnick failed to refund his money, Foster filed suit in federal district court claiming violations of both state and federal securities laws.

5. 15 U.S.C.A. § 77e (West 1981).

6. *Id.* at § 77*l* (1).

7. *Id.* at §§ 77q, 77*l* (2).

*Proceedings Before the District Court*

Foster presented four counts in his first complaint. In Count I, he claimed damages for the sale of an unregistered security, which is made unlawful by § 5 of the Securities Act of 1933,[5] and actionable by § 12(1) of that Act.[6] The district court dismissed this federal registration claim as time barred and that decision has not been appealed. Count I also stated a registration claim under Alabama law. We discuss this latter claim in the section of this opinion addressed to certification of controlling state law questions.

In Count II, Foster claimed damages for the sale of a security by means of false written or oral communications in violation of §§ 17 and 12(2) of the 1933 Act[7] and in violation of various Alabama code sections. The district court dismissed Foster's federal § 17 claim on the ground that the section does not afford a private right of action. That decision has not been appealed. Jesup & Lamont's liability founded on § 12(2) of the 1933 Act is the main subject of this opinion. The state law claims raised in Count II are discussed below, where we certify questions to the Alabama Supreme Court.

In Count III, Foster alleged violation ·of § 10(b) of the Exchange Act of 1934[8] and of Rule 10b–5 promulgated by the Securities and Exchange Commission ("SEC").[9] As construed by the courts, these provisions provide a cause of action for fraudulent practices undertaken in connection with the purchase or sale of a security. Finally, in Count IV, Foster sought compensatory and punitive damages for common law deceit. Foster learned after he filed his complaint that Jesup & Lamont and Minnick had rescinded their sales agency agreement before he invested in Texas Partners. He subsequently amended his complaint to exclude Jesup & Lamont as a defendant with respect to Counts III and IV relating to fraud under § 10(b) of the Exchange Act and for common law deceit.

8. 15 U.S.C.A. § 78j(b) (West 1981).

9. 17 C.F.R. § 240.10b–5 (1984).

Thus, there are no federal or state claims against Jesup & Lamont under Counts III or IV.

The only federal claim, the § 12(2) claim in Count II, and the several state law claims in Counts I and II were tried before a jury in the United States District Court for the Southern District of Alabama. Foster testified in his own behalf and introduced into evidence the pretrial depositions of Jordan and Minnick. Foster also presented an expert witness, Krebs, a former Alabama securities commissioner who testified about the customary duty of underwriters to control distribution of offering documents in private offerings. Jesup & Lamont presented two witnesses in its own behalf at trial—Curd, its president, and Thors, its vice-president and syndicate manager.

The case was submitted to the jury on special interrogatories, all of which were answered unfavorably to Jesup & Lamont.[10] The district court entered judgment against Jesup & Lamont based on the jury's answers, and Jesup & Lamont subsequently appealed from the judgment and from denial of its various post-trial motions.[11]

*Foster's Section 12(2) Claim*

The sole federal securities law claim against Jesup & Lamont remaining at trial was brought under § 12(2) of the Securities Act of 1933.[12] The only element of that claim at issue here is whether Jesup & Lamont was a "seller" within the meaning of § 12(2). The section provides that "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact ... shall be liable to the person purchasing such security from him." 15 U.S.C.A. § 77*l*(2) (West 1981).

At first blush, Jesup & Lamont appears plainly beyond the reach of § 12(2). The firm did not sell anyone an interest in Texas Partners and had no direct contact with Foster. Moreover, Foster actually bought his interest from Minnick, who met with Foster and touted the security to persuade him to invest. Courts have generally recognized, however, that defendants who do not actually sell the security in question may nonetheless be liable under § 12.[13]

In delimiting the scope of § 12, authority controlling in this circuit[14] has sought to determine whether a defendant's role "constituted him a seller for purposes of that section." *Junker v. Crory*, 650 F.2d 1349, 1360 (5th Cir. July 17, 1981). Liability of secondary participants has been held to depend on whether "the injury to

10. As relevant here, the jury found that Jesup & Lamont had materially aided in the sale of unregistered securities to Foster, and that Jesup & Lamont was a substantial factor in the sale of a security to Foster. 4 Rec. at 513–14.

11. We postponed ruling on Foster's motion to dismiss appeal No. 83–7573, which was based on the ground that the judgment appealed from is not a final judgment. Foster argues that the district court's judgment of September 30, 1983, is not a final judgment because the question of attorneys' fees was not decided. *See, e.g., C.I.T. Corp. v. Nelson*, 743 F.2d 774 (11th Cir.1984); *McQurter v. City of Atlanta*, 724 F.2d 881, 882 (11th Cir.1984). We note, however, that the district court entered an order awarding attorneys' fees on March 16, 1984, and that both Foster and Jesup & Lamont filed timely notices of appeal from that order. Given this state of the record, we conclude that the jurisdictional challenge to Jesup & Lamont's appeal is moot, and consequently we do not address it.

12. 15 U.S.C.A. § 77*l*(2) (West 1981).

13. Foster has not alleged that Jesup & Lamont "controlled" Minnick within the meaning of § 15 of the Securities Act of 1933, 15 U.S.C.A. § 77*o* (West 1981), nor has Foster alleged that Jesup & Lamont actually made the sale acting as Minnick's agent. *See Murphy v. Cady*, 30 F.Supp. 466, 469–70 (D.Me.1939). We are required to look beyond these basic amplifications of § 12(2) to assess Jesup & Lamont's potential liability in the present case.

14. In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

the plaintiff flow[ed] directly and proximately from the [defendant's] actions." *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680, 693 (5th Cir.1971) (quoting *Lennerth v. Mendenhall*, 234 F.Supp. 59, 65 (N.D.Ohio 1964)). Section 12 will reach those "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." *Pharo v. Smith*, 621 F.2d 656, 667 (5th Cir.1980).

In *Hill York*, § 12 liability attached to defendants who engineered a franchise sales scheme, but who did not execute the sales in question. Through the sales scheme, capital was attracted to corporations that purportedly would market restaurant franchises. Shares in the corporations were marketed by means of sales brochures that omitted to inform buyers that similar operations by the same defendants were targets of pending SEC investigations. 448 F.2d at 690. Even though the defendants had not sold to the plaintiffs, the court in *Hill York* considered them to have been "the motivating force" behind the sales scheme:

> They sought out the original incorporators of Florida Franchise and then trained them to solicit additional capital for the corporation. They provided the sales brochures designed to secure this additional capital. They rendered advice on every aspect of the corporate formation and subsequent development. In fact, the defendants did everything but effectuate the actual sale.

*Id.* at 693. Given this pervasive involvement of the defendants, the court had little difficulty concluding that "the plaintiffs would not have purchased this stock had the defendants not traveled to Florida carrying their bag of promotional ideas," *id.*, and that consequently the defendants were "persons who sold or offered to sell" within the meaning of § 12. *Id.*

In *Junker*, § 12(2) liability attached to a lawyer who suggested a merger between two related corporations. The lawyer attended shareholders' meetings of the disappearing corporation and urged approval of the merger terms. The merger was consummated to the detriment of a minority shareholder, a result that would have been apparent in advance had the two corporations been properly valued. The court in *Junker* found the evidence sufficient to establish that the lawyer was a "key participant" and an "active negotiator" in the transaction, and the court concluded that he was therefore brought within "the scope of the seller definition under Section 12(2)." 650 F.2d at 1360.

Finally, in *Croy v. Campbell*, 624 F.2d 709 (5th Cir.1980), the court declined to hold a tax lawyer liable as a § 12(2) seller after a real estate investment he recommended failed to produce expected tax benefits. The court relied on the fact that the lawyer did not make representations concerning the project's advisability, except as a tax matter, and further that the lawyer did not prepare the sales brochure or attempt to persuade the plaintiffs to invest in the project. *Id.* at 714. The court also observed that the plaintiffs decided to invest only after talking with the project's developer and obtaining independent advice. *Id.* The court in *Croy v. Campbell* concluded that "[a]pplying these findings to the 'seller' concept ... we cannot say that the defendant's participation in this transaction proximately caused the plaintiffs' injury, or that they would not have purchased the security 'but for' his actions." *Id.*

Foster presented sufficient evidence in the present case to establish that he relied on Jesup & Lamont's apparent role in the offering when he decided to invest in Texas Partners. There is no dispute that Jesup & Lamont's name was prominently displayed on the offering document Minnick gave to Foster. In weighing this fact, we have been mindful that the identity of an underwriter associated with an offering often affects particular investment decisions.[15]

---

**15.** The SEC has recognized the heightened importance of underwriters in new high-risk ventures:

Jesup & Lamont held itself out in the Texas Partners offering document as the "best efforts" underwriter for the offering, and of course we must assume that the jury credited Foster's testimony that he relied on the existence of that relationship in deciding to invest in Texas Partners.

■ We have concluded, however, that Jesup & Lamont's role as an underwriter and Foster's reliance on that fact are insufficient to make the firm a "seller" within the meaning of § 12. The different schemes of liability provided in § 11 and § 12 of the 1933 Act show that Congress did not intend § 12 to make underwriters liable simply because they are underwriters. Section 11 extends liability to "every underwriter with respect to [a given] security," 15 U.S.C.A. § 77k(a)(5) (West 1981).[16] Section 12, on the other hand, extends liability only to one who "offers or sells a security." *Id.* at § 77*l*. Further, a seller under § 12 is liable only to "the person purchasing such security from him." *Id.* If an underwriter were a "substantial factor" in the sale of a security simply by virtue of an investor's reliance on the underwriter's participation in a given offering, underwriters would always be subject to liability as § 12(2) "sellers". The fact that Congress made every underwriter liable in § 11, but not in § 12, suggests that underwriters are not to be liable under § 12 solely by virtue of their status as underwriters.

Since § 12 does not provide for underwriter liability *per se*, an underwriter must also be a seller of the security in question to be liable under the section. This view is consistent with cases holding that where there is more than one underwriter of an issue, each underwriter may be liable under § 12 only to plaintiffs to whom it sold. *In re Itel Securities Litigation*, 89 F.R.D. 104, 121 (N.D.Cal.1981); *see also Unicorn Field, Inc. v. The Cannon Group, Inc.*, 60 F.R.D. 217, 222–23 (S.D.N.Y.1973). Presumably, other underwriters in a multiple underwriter offering might also be § 12(2) "sellers," but to support this result, our precedent would require that their participation be a "substantial factor" in the particular sale in question.

The Texas Partners offering document, on which Foster relied, presented a sales arrangement contemplating more than one seller. The offering memorandum said: "In addition, other persons may receive commissions for selling Interests, including Minnick Resources Management, Inc." Pl.Ex. 1 at 4. There is no dispute that Foster actually bought his interest from Minnick. On these facts, we conclude that something more than Jesup & Lamont's apparent role as underwriter must be shown to make the firm liable under § 12.

Foster presented the deposition testimony of his accountant, which tended to show something more than mere underwriter status on the part of Jesup & Lamont. Jordan's testimony was sufficient to prove that Curd reassured the accountant about Minnick even after Jesup & Lamont had withdrawn from the offering. As noted, Curd was alleged to have said "We are

By associating himself with a proposed offering, an underwriter impliedly represents that he has made [a due diligence] investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus.

Securities Act of 1933 Release No. 5275 (July 26, 1972) (quoting *The Richmond Corp.*, 41 S.E.C. 398, 406 (1963)). As one court has observed, "Prospective investors look to the underwriter—a fact well known to all concerned and especially to the underwriter—to pass on the soundness of the security and the correctness of the registration statement and prospectus." *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir.), *cert. denied*, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); *see also Escott v. Barchris Construction Corp.*, 283 F.Supp. 643, 696 (S.D.N.Y.1968) ("prospective investors rely upon the reputation of the underwriters in deciding whether to purchase the securities."). Furthermore, we do not believe the identity of the underwriter is important to investors only in registered offerings.

16. Section 11 applies only to issues for which a registration statement is in effect, and thus does not apply in this case. Section 12, by contrast, applies whether or not an issue is exempt from registration.

involved in this offering document and we know of nothing that would effect [sic] our relationship with Mr. Minnick." 3 Rec. at 195. We have carefully considered the likely impact of this statement on Foster's decision to buy, and we have concluded as a matter of law that the statement does not amount to the active participation in a sale that is necessary for Jesup & Lamont to be liable as a § 12 "seller".[17]

We note that there was no direct communication between Foster and Jesup & Lamont, and that the only communication between Jesup & Lamont and the accountant, Jordan, was a single, casual comment concerning the firm's involvement with the offering and its continued good opinion of Minnick. The statement was not addressed directly to the merit of Texas Partners or to the critical question of whether to invest in the venture.

The primary role Minnick played in the transaction further persuades us that Jesup & Lamont was not a "substantial factor" in the sale. Minnick met with Foster in Alabama in the final days of 1980 to discuss Texas Partners at length. In this face-to-face meeting, Foster questioned Minnick about his background and about the proposed offering. While such an encounter is no substitute for an underwriter's independent investigation, the meeting in this case appears to have given Foster sufficient confidence in Minnick and in Texas Partners that he did not see a need to confer further with Jesup & Lamont.

■ Having concluded that the role of underwriter *per se* is not sufficient, by itself, to impose liability under § 12, we also conclude on the basis of the totality of the circumstances in this case, that the very limited additional involvement in the form of the single comment to Foster's accountant is not sufficient "participation in the buy-sell transaction ... [to be] a substantial factor in causing the transaction to take place." *Pharo v. Smith*, 621

F.2d at 667. The extensive and active involvement in bringing about the buy-sell transaction which was present in *Hill York* and *Junker* has simply not been shown on these facts. This case is more similar to *Croy v. Campbell*, in which the defendant did not attempt to persuade the plaintiff to buy, and in which the plaintiff invested his money only after meeting the developer himself and otherwise obtaining independent advice. The court in *Croy v. Campbell* decided the defendant in that case was not a § 12(2) seller, and we reach the same conclusion with respect to Jesup & Lamont in the present case.

## Other Federal Issues on Appeal

Jesup & Lamont asks us to review three of the district court's evidentiary rulings. First, the district court allowed Krebs, a former Alabama securities commissioner, to testify for Foster that customarily in a private offering the underwriter is responsible for controlling the offering documents. Krebs testified further that Jesup & Lamont had been reckless and had failed to comply with industry standards in its management of the Texas Partners documents. Jesup & Lamont argues that this testimony was not relevant to any issue before the jury and that the testimony unfairly prejudiced its case by confusing the jury.

■ We believe the district court did not abuse its discretion in admitting testimony about customary duties of underwriters in private offerings. The evidence concerned the manner in which offering documents are normally controlled and thus was relevant in determining whether Jesup & Lamont was a "substantial factor" in the sale, the federal standard, or whether Jesup & Lamont "materially aided" the sale, the state standard discussed below.

■ Jesup & Lamont also objected to the admission of Foster's testimony about reliance on Jesup & Lamont's name. We

---

17. We do not suggest that the statement, under all the other circumstances of this case, would not support liability under some other provision of law, such as § 10(b) of the 1934 Act or common law deceit. We are only called upon here, however, to consider whether Jesup & Lamont was a "seller" under § 12 of the 1933 Act.

believe the testimony is relevant to whether the misrepresentation of Jesup & Lamont's role was material,[18] and we therefore conclude that its admission was not error.

■ Finally, Jesup & Lamont objected to limits the district court placed on its cross-examination of Foster. Jesup & Lamont sought to explore the tax motives behind Foster's investment in Texas Partners. The district court allowed Jesup & Lamont to establish that one factor motivating Foster's investment decision was anticipated tax benefits. The court prevented Jesup & Lamont from questioning Foster about the specific amounts he had deducted. We believe these rulings were well within the district court's discretion.[19]

### Certification of Determinative State Law Questions

We turn therefore to the various state law claims against Jesup & Lamont since we have concluded that the firm is not subject to liability as a § 12(2) seller under federal law. As noted, Counts I and II remained against Jesup & Lamont in Foster's amended complaint, and Foster alleged violations of Alabama law in each of these counts.

In Count I, Foster claimed damages for the sale of an unregistered security, which is made unlawful by § 8–6–4 of the Ala-

bama Code,[20] and which is made actionable by § 8–6–19[21] ("Section 19" or "§ 19"). Section 19 extends liability to one who "sells or offers to sell" a security, and also to "every broker-dealer or agent who materially aids in the sale." Ala.Code § 8–6–19(a), (b) (West 1984). The district court instructed the jury that "materially aided" is equivalent to "substantial factor." 4 Rec. at 489. At trial, Foster objected to this instruction. Because the jury returned a verdict in favor of Foster, that objection is moot. However, with respect to the issue of exactly how much evidence is legally sufficient to support the jury verdict, Foster contends on appeal that less participation is needed to meet Alabama's "materially aided" standard than is needed to show that a defendant was a "substantial factor" in a sale and thus a "seller" under federal law. Apparently, Foster bases his argument on the language of § 19, which refers to "the nonseller who is so liable."[22] Unlike federal § 12, which limits liability to sellers, the Alabama provision imposes liability on a broader range of participants in securities transactions. In this respect, § 19 is similar to § 11 of the 1933 Act,[23] which also lists specific participants who are subject to liability.

We have found no Alabama case discussing the level of participation required for secondary liability under § 19. Because

18. *Cf. TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (in proxy setting, "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); *see also SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir.1982) ("The test for determining materiality is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.").

19. We need not address Foster's contention on appeal that the district court was incorrect to apply the Alabama statutory rate in awarding prejudgment interest. Our disposition of Foster's federal § 12(2) claim leaves only state law claims as possible bases of liability. We consequently find no error in the district court's use of the state statutory rate.

20. Ala.Code § 8–6–4 (Michie 1984).

21. *Id.* at § 8–6–19.

22. Alabama Code § 8–6–19(b), in its entirety, reads:

Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

23. 15 U.S.C.A. § 77k (West 1981).

this point has become determinative in the present case, we certify the following question to the Alabama Supreme Court for instruction pursuant to Ala.R.App.P. 18:

Question One: Has a securities firm "materially aided" an unlawful sale of a security within the meaning of Alabama Code § 8–6–19(b) under the following circumstances:

(a) The firm's name was displayed prominently on an offering document used in connection with the sale, and the firm was presented in the document as the issue's primary best efforts underwriter, even though the firm had withdrawn from the offering;

(b) The buyer relied on the firm's participation in the offering in reaching his decision to purchase an interest;

(c) There is substantial evidence in the record from which we must infer that the jury found that an underwriter customarily is responsible for controlling distribution of the offering documents in a private offering;

(d) The firm's president told the buyer's accountant that the firm was "involved" in the offering document after the firm had rescinded its agreement to help sell the security;

(e) The buyer did not directly communicate with the brokerage firm in reaching his decision to invest;

(f) The buyer met with the promoter of the issue to discuss the promoter's background and to discuss various business aspects of the venture before deciding to invest;

(g) The buyer delivered his check to the promoter in exchange for the security.

24. Ala.Code § 8–6–17 (Michie 1984). This section too may have analogues in federal law. An Alabama court has observed in a criminal case that § 8–6–17 is "virtually identical" with the language of Rule 10b–5. *Buffo v. State,* 415 So.2d 1158, 1162 (Ala.1982). We pause only to note that the Alabama section is also similar to § 17(a) of the 1933 Act, 15 U.S.C.A. § 77q(a) (West 1981), which is perhaps not surprising given the similarity between the two federal provisions.

Count II of Foster's complaint contains two state law claims for damages based on the sale of a security by means of false written or oral communications. The first of these is grounded on Ala.Code § 8–6–19(a)(2). We believe that the disposition of this Alabama claim would be determined by the same question we have certified above with respect to Foster's state law registration claim. The viability of each of these claims depends on the Alabama Supreme Court's application of the "materially aided" standard to the facts of this case.

Foster's other basis under state law for his Count II false communication claim is Ala.Code § 8–6–17.[24] The district court treated this section as affording a private right of action and concluded on the basis of an analogy to federal Rule 10b–5 actions that scienter must be shown to support recovery under the section. Jesup & Lamont contends on appeal that the section does not afford a private right of action, while Foster appeals contending that an action under the section does not require scienter. We have found no Alabama case addressing either of these questions. Because they may determine Foster's right to recover if he is not successful with his other claims under Alabama law, we certify the following additional questions to the Alabama Supreme Court for instruction under Ala.R.App.P. 18:

Question Two: Does Alabama Code § 8–6–17 afford a private right of action?

Question Three: If a private cause of action is available under Alabama Code § 8–6–17: (a) is proof of scienter necessary to maintain the action? and (b) would severe recklessness meet the scienter requirement?[25]

25. Special interrogatory number ten asked "Has the Plaintiff proved by a preponderance of the evidence that Jesup & Lamont engaged knowingly in misconduct or acted with severe recklessness?" The jury answered "Yes." *See* 4 Rec. at 515, line 17. We note that if Foster's recovery is supported under the "materially aided" standard of Ala.Code § 8–6–19, the Supreme Court of Alabama may find it unnecessary to reach questions Two and Three concerning Ala. Code § 8–6–17. Similarly, the Alabama Supreme Court may find it unnecessary to decide

The particular phrasing used in the certified questions is not to restrict the Alabama Supreme Court's consideration of the problems involved and the issues as the Alabama Supreme Court perceives them to be in its analysis of the record certified in this case.

### Conclusion

We have concluded that Jesup & Lamont was not a "seller" of an interest in Texas Partners, and consequently we reverse the district court's judgment holding the firm liable under § 12(2) of the Securities Act of 1933, 15 U.S.C.A. § 77*l*(2) (West 1981). We have certified three questions of Alabama securities law to the Supreme Court of Alabama for instruction pursuant to Ala. R.App.P. 18. Accordingly, our final decision with respect to Foster's state law claims will await answer from the Alabama Supreme Court. The several other claims on appeal are without merit.[26]

AFFIRMED in part, REVERSED in part, AND QUESTIONS OF STATE LAW CERTIFIED TO THE ALABAMA SUPREME COURT.

---

whether Ala.Code § 8-6-17 requires scienter if the court determines that the special interrogatories established sufficient scienter assuming *arguendo* that scienter is required. *See* 4 Rec. at 515, lines 17-20. The Supreme Court of the United States has reserved decision on whether recklessness is sufficient to establish scienter. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); *Aaron v. SEC,* 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611 (1980). Some circuit courts of appeal have held that recklessness will support an action under Rule 10b-5. *See, e.g., Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d 38, 44 (2d Cir.1978).

**26.** Foster has appealed from the district court's award of attorneys' fees. We express no opinion about attorneys' fees at this time, but will address the question as necessary after the Alabama Supreme Court has instructed us on the underlying state law issues.

EXHIBIT "A"

# TEXAS PARTNERS '80 LTD.

**Jesup & Lamont Securities Co., Inc.**

ESTABLISHED 1877

100 Park Avenue, New York, NY 10017

TELEPHONE (212) 573–6800
TELEX 233478
62890

MEMBER
NEW YORK STOCK EXCHANGE, INC.