759 F.2d 838
 Blue Sky L. Rep. P 72,221, Fed. Sec. L. Rep. P 92,035
J. Don FOSTER, an individual, Plaintiff-Appellee,
v.
JESUP AND LAMONT SECURITIES CO., INC., a corporation,
Defendant-Appellant, Cross-Appellee.
J. Don FOSTER, an individual, Plaintiff-Appellant, Cross-Appellee,
v.
TEXAS PARTNERS '80 LTD., a limited partnership, Minnick
Resources Management, Inc., a corporation, F. Wendell
Minnick, an individual, Jesup and Lamont Securities Co.,
Inc., a corporation, and Pyron Exploration and Drilling
Corp., a corporation, Defendants-Appellees, Cross-Appellants.
 Nos. 83-7573, 84-7255.
 United States Court of Appeals,
Eleventh Circuit.
 May 6, 1985.
 
 John L. Schaub, John L. Taylor, Jr., Atlanta, Ga., William H. Hardie, Jr., Mobile, Ala., for defendant-appellant, cross-appellee Jesup and Lamont Securities Co., Inc.
 W. Ramsey McKinney, Jr., Mobile, Ala., for J.D. Foster.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before KRAVITCH and ANDERSON, Circuit Judges, and ATKINS*, District Judge.
 R. LANIER ANDERSON, III, Circuit Judge:
 
 
 1
 This securities case requires us to consider what conduct makes one a "seller" within the meaning of Sec. 12(2) of the Securities Act of 1933.[1] Because we conclude that appellant was not a "seller" of the securities in question, we reverse the district court's judgment with respect to appellee's Sec. 12(2) claim. Appellant has also been found liable under Alabama securities laws. We conclude that the legal sufficiency of these latter claims depends on important questions of state law that have not been ruled upon by the courts of Alabama. Accordingly, we certify these questions to the Alabama Supreme Court for instruction.
 
 Facts
 
 2
 Foster, plaintiff below, invested in a Texas limited partnership in December, 1980 (Texas Partners '80, Ltd., hereafter "Texas Partners"). Texas Partners' ostensible business purpose was to develop oil and gas wells. In fact, no substantial drilling operations were undertaken on behalf of the partnership, and Foster lost the amount he invested.
 
 
 3
 Foster bought his interest from Minnick, sole shareholder and president of Minnick Resources Management, Inc., which was the general partner in Texas Partners.[2] The only party involved with Texas Partners that defended before the district court and the only party opposing Foster before this court is Jesup & Lamont Securities Co. ("Jesup & Lamont"), a New York securities dealer whose name appeared on the Texas Partners offering document.
 
 
 4
 Jesup & Lamont first became involved in the offering in June of 1980 when its president, Curd, and its vice-president, Thors, met with Minnick to discuss the firm's participation. Minnick and Jesup & Lamont subsequently entered into an agency agreement whereby the firm promised to use its "best efforts" to sell interests in Texas Partners. Jesup & Lamont was to receive a ten percent commission for interests it sold, and a two percent commission for interests sold by Minnick. Jesup & Lamont was not required by the agreement to sell any interests, but only to use its best efforts in that regard.
 
 
 5
 Following the initial meeting with Minnick, Curd inquired of Minnick's former employers and of his banker about Minnick's standing in the investment community. These references were favorable, and reported that Minnick "had a reputation of being successful in oil and gas." 4 Rec. at 347. Jesup & Lamont did not investigate other particulars about Minnick, such as how he had fared in specific oil and gas deals or his standing with trade creditors. Jesup & Lamont also did not investigate the particulars of the Texas Partners undertaking, such as the status of the partnership's leases or the financial feasibility of the planned drilling operations.
 
 
 6
 The Texas Partners venture went forward and an offering memorandum was prepared for use in the sale of interests in the partnership. Minnick testified by deposition that he drafted the offering memorandum, but that it was reviewed by a lawyer at Shea & Gould, a New York law firm that represented Minnick in the proposed offering. Shea & Gould was also general counsel to Jesup & Lamont. Jesup & Lamont had no role in the drafting or printing of the offering memorandum, the cost of which was borne by Minnick. Three hundred copies were printed and delivered to Minnick, who sent thirty copies to Jesup & Lamont.
 
 
 7
 The offering memorandum comprises sixty pages of text and nine exhibits. The cover of the memorandum displays the limited partnership's name at the top and Jesup & Lamont's name, address, and phone number at the bottom, with the notation that the firm is a member of the New York Stock Exchange.[3] The same general information about Jesup & Lamont is presented on the first inside page and a legend appears in two places early in the document stating that "These Limited Partnership Interests are being primarily distributed through Jesup & Lamont Securities Co., Inc." Pl.Ex. 1. In the text of the offering memorandum is the information that Texas Partners and Jesup & Lamont had entered into a best efforts selling arrangement, and that "In addition, other persons may receive commissions for selling Interests, including Minnick Resources Management, Inc." Id. at 4. The offering memorandum is dated July 30, 1980.
 
 
 8
 Jesup & Lamont and Minnick rescinded their sales agency agreement shortly after this date.[4] In his deposition, Minnick testified that he had been unhappy with Jesup & Lamont's performance. At trial, Curd testified that Jesup & Lamont had decided "the item was basically not marketable." 4 Rec. at 348. Although the principals agreed to rescind the best efforts agreement, they disagreed about who should pay for the offering documents. Minnick wanted Jesup & Lamont to pay the printing costs because the firm's lack of success had resulted in rescission of the agreement. Jesup & Lamont took the position that it had no responsibility to pay because the agreement only required "best efforts," which the firm felt it had given. There is no dispute in the record that Minnick told Curd he was going to remove Jesup & Lamont's name from the document. Minnick testified he attempted to do so for several offering documents by using scissors to cut out at least some of the references to Jesup & Lamont. Jesup & Lamont did not attempt to have Minnick surrender to the firm the offering documents in his possession.
 
 
 9
 Foster was first introduced to Texas Partners by his accountant, Jordan, who had met Minnick in May of 1980. Jordan testified by deposition that he traveled to New York in November of 1980 on business not related to Texas Partners, but which involved Jesup & Lamont. Jordan took advantage of this opportunity to question Curd about Minnick's prior activities. Curd reassured him about Minnick even though, unknown to Jordan, Jesup & Lamont had already withdrawn from the Texas Partners offering. Jordan testified that at the November meeting, Curd told him "We are involved in this offering document and we know of nothing that would effect [sic] our relationship with Mr. Minnick." 3 Rec. at 195. At trial, Curd denied the occurrence of the meeting at which this statement allegedly was made.
 
 
 10
 Minnick and Foster were brought together for the first time by Jordan at a meeting attended by the three in Jordan's Alabama office in late December of 1980. The meeting lasted for one to two hours and focused on Foster's possible purchase of an interest in Texas Partners. Foster questioned Minnick about his background and about the particulars of the undertaking. Minnick made representations about the amount of money that had already been raised by Texas Partners, and told Foster that the money was to be used in drilling numerous wells. Foster was given a copy of the offering memorandum, which bore Jesup & Lamont's name. He testified he studied the document after the meeting and relied on it in eventually deciding to buy one-half of an interest in Texas Partners. Foster did not communicate directly with anyone at Jesup & Lamont before he invested in Texas Partners.
 
 
 11
 The specific representations in the offering memorandum Foster said he relied on that later proved false were: (1) that Jesup & Lamont was involved in the offering; (2) that the proceeds of the offering would be used by Texas Partners in development drilling for oil and gas; (3) that the general partner, Minnick Resources Management, Inc., would contribute five percent of the drilling costs; and (4) that investments would be refunded if a minimum amount were not raised.
 
 
 12
 Jordan's association with Minnick continued after Foster's purchase. Jordan learned from work he did for the drilling company, Pyron Exploration and Drilling Corp., that Texas Partners had not raised the required minimum in investments. Further, Jordan discovered that the money raised by Texas Partners had not been applied to development drilling as promised. When Jordan notified Foster of these facts, Foster called Minnick, who assured him that the money he had invested would be refunded. When Minnick failed to refund his money, Foster filed suit in federal district court claiming violations of both state and federal securities laws.
 
 Proceedings Before the District Court
 
 13
 Foster presented four counts in his first complaint. In Count I, he claimed damages for the sale of an unregistered security, which is made unlawful by Sec. 5 of the Securities Act of 1933,[5] and actionable by Sec. 12(1) of that Act.[6] The district court dismissed this federal registration claim as time barred and that decision has not been appealed. Count I also stated a registration claim under Alabama law. We discuss this latter claim in the section of this opinion addressed to certification of controlling state law questions.
 
 
 14
 In Count II, Foster claimed damages for the sale of a security by means of false written or oral communications in violation of Secs. 17 and 12(2) of the 1933 Act[7] and in violation of various Alabama code sections. The district court dismissed Foster's federal Sec. 17 claim on the ground that the section does not afford a private right of action. That decision has not been appealed. Jesup & Lamont's liability founded on Sec. 12(2) of the 1933 Act is the main subject of this opinion. The state law claims raised in Count II are discussed below, where we certify questions to the Alabama Supreme Court.
 
 
 15
 In Count III, Foster alleged violation of Sec. 10(b) of the Exchange Act of 1934[8] and of Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").[9] As construed by the courts, these provisions provide a cause of action for fraudulent practices undertaken in connection with the purchase or sale of a security. Finally, in Count IV, Foster sought compensatory and punitive damages for common law deceit. Foster learned after he filed his complaint that Jesup & Lamont and Minnick had rescinded their sales agency agreement before he invested in Texas Partners. He subsequently amended his complaint to exclude Jesup & Lamont as a defendant with respect to Counts III and IV relating to fraud under Sec. 10(b) of the Exchange Act and for common law deceit. Thus, there are no federal or state claims against Jesup & Lamont under Counts III or IV.
 
 
 16
 The only federal claim, the Sec. 12(2) claim in Count II, and the several state law claims in Counts I and II were tried before a jury in the United States District Court for the Southern District of Alabama. Foster testified in his own behalf and introduced into evidence the pretrial depositions of Jordan and Minnick. Foster also presented an expert witness, Krebs, a former Alabama securities commissioner who testified about the customary duty of underwriters to control distribution of offering documents in private offerings. Jesup & Lamont presented two witnesses in its own behalf at trial--Curd, its president, and Thors, its vice-president and syndicate manager.
 
 
 17
 The case was submitted to the jury on special interrogatories, all of which were answered unfavorably to Jesup & Lamont.[10] The district court entered judgment against Jesup & Lamont based on the jury's answers, and Jesup & Lamont subsequently appealed from the judgment and from denial of its various post-trial motions.[11]
 
 Foster's Section 12(2) Claim
 
 18
 The sole federal securities law claim against Jesup & Lamont remaining at trial was brought under Sec. 12(2) of the Securities Act of 1933.[12] The only element of that claim at issue here is whether Jesup & Lamont was a "seller" within the meaning of Sec. 12(2). The section provides that "[a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact ... shall be liable to the person purchasing such security from him." 15 U.S.C.A. Sec. 77l (2) (West 1981).
 
 
 19
 At first blush, Jesup & Lamont appears plainly beyond the reach of Sec. 12(2). The firm did not sell anyone an interest in Texas Partners and had no direct contact with Foster. Moreover, Foster actually bought his interest from Minnick, who met with Foster and touted the security to persuade him to invest. Courts have generally recognized, however, that defendants who do not actually sell the security in question may nonetheless be liable under Sec. 12.[13]
 
 
 20
 In delimiting the scope of Sec. 12, authority controlling in this circuit[14] has sought to determine whether a defendant's role "constituted him a seller for purposes of that section." Junker v. Crory, 650 F.2d 1349, 1360 (5th Cir. July 17, 1981). Liability of secondary participants has been held to depend on whether "the injury to the plaintiff flow[ed] directly and proximately from the [defendant's] actions." Hill York Corp. v. American International Franchises, Inc., 448 F.2d 680, 693 (5th Cir.1971) (quoting Lennerth v. Mendenhall, 234 F.Supp. 59, 65 (N.D.Ohio 1964)). Section 12 will reach those "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." Pharo v. Smith, 621 F.2d 656, 667 (5th Cir.1980).
 
 
 21
 In Hill York, Sec. 12 liability attached to defendants who engineered a franchise sales scheme, but who did not execute the sales in question. Through the sales scheme, capital was attracted to corporations that purportedly would market restaurant franchises. Shares in the corporations were marketed by means of sales brochures that omitted to inform buyers that similar operations by the same defendants were targets of pending SEC investigations. 448 F.2d at 690. Even though the defendants had not sold to the plaintiffs, the court in Hill York considered them to have been "the motivating force" behind the sales scheme:
 
 
 22
 They sought out the original incorporators of Florida Franchise and then trained them to solicit additional capital for the corporation. They provided the sales brochures designed to secure this additional capital. They rendered advice on every aspect of the corporate formation and subsequent development. In fact, the defendants did everything but effectuate the actual sale.
 
 
 23
 Id. at 693. Given this pervasive involvement of the defendants, the court had little difficulty concluding that "the plaintiffs would not have purchased this stock had the defendants not traveled to Florida carrying their bag of promotional ideas," id., and that consequently the defendants were "persons who sold or offered to sell" within the meaning of Sec. 12. Id.
 
 
 24
 In Junker, Sec. 12(2) liability attached to a lawyer who suggested a merger between two related corporations. The lawyer attended shareholders' meetings of the disappearing corporation and urged approval of the merger terms. The merger was consummated to the detriment of a minority shareholder, a result that would have been apparent in advance had the two corporations been properly valued. The court in Junker found the evidence sufficient to establish that the lawyer was a "key participant" and an "active negotiator" in the transaction, and the court concluded that he was therefore brought within "the scope of the seller definition under Section 12(2)." 650 F.2d at 1360.
 
 
 25
 Finally, in Croy v. Campbell, 624 F.2d 709 (5th Cir.1980), the court declined to hold a tax lawyer liable as a Sec. 12(2) seller after a real estate investment he recommended failed to produce expected tax benefits. The court relied on the fact that the lawyer did not make representations concerning the project's advisability, except as a tax matter, and further that the lawyer did not prepare the sales brochure or attempt to persuade the plaintiffs to invest in the project. Id. at 714. The court also observed that the plaintiffs decided to invest only after talking with the project's developer and obtaining independent advice. Id. The court in Croy v. Campbell concluded that "[a]pplying these findings to the 'seller' concept ... we cannot say that the defendant's participation in this transaction proximately caused the plaintiffs' injury, or that they would not have purchased the security 'but for' his actions." Id.
 
 
 26
 Foster presented sufficient evidence in the present case to establish that he relied on Jesup & Lamont's apparent role in the offering when he decided to invest in Texas Partners. There is no dispute that Jesup & Lamont's name was prominently displayed on the offering document Minnick gave to Foster. In weighing this fact, we have been mindful that the identity of an underwriter associated with an offering often affects particular investment decisions.[15] Jesup & Lamont held itself out in the Texas Partners offering document as the "best efforts" underwriter for the offering, and of course we must assume that the jury credited Foster's testimony that he relied on the existence of that relationship in deciding to invest in Texas Partners.
 
 
 27
 We have concluded, however, that Jesup & Lamont's role as an underwriter and Foster's reliance on that fact are insufficient to make the firm a "seller" within the meaning of Sec. 12. The different schemes of liability provided in Sec. 11 and Sec. 12 of the 1933 Act show that Congress did not intend Sec. 12 to make underwriters liable simply because they are underwriters. Section 11 extends liability to "every underwriter with respect to [a given] security," 15 U.S.C.A. Sec. 77k(a)(5) (West 1981).[16] Section 12, on the other hand, extends liability only to one who "offers or sells a security." Id. at Sec. 77l. Further, a seller under Sec. 12 is liable only to "the person purchasing such security from him." Id. If an underwriter were a "substantial factor" in the sale of a security simply by virtue of an investor's reliance on the underwriter's participation in a given offering, underwriters would always be subject to liability as Sec. 12(2) "sellers". The fact that Congress made every underwriter liable in Sec. 11, but not in Sec. 12, suggests that underwriters are not to be liable under Sec. 12 solely by virtue of their status as underwriters.
 
 
 28
 Since Sec. 12 does not provide for underwriter liability per se, an underwriter must also be a seller of the security in question to be liable under the section. This view is consistent with cases holding that where there is more than one underwriter of an issue, each underwriter may be liable under Sec. 12 only to plaintiffs to whom it sold. In re Itel Securities Litigation, 89 F.R.D. 104, 121 (N.D.Cal.1981); see also Unicorn Field, Inc. v. The Cannon Group, Inc., 60 F.R.D. 217, 222-23 (S.D.N.Y.1973). Presumably, other underwriters in a multiple underwriter offering might also be Sec. 12(2) "sellers," but to support this result, our precedent would require that their participation be a "substantial factor" in the particular sale in question.
 
 
 29
 The Texas Partners offering document, on which Foster relied, presented a sales arrangement contemplating more than one seller. The offering memorandum said: "In addition, other persons may receive commissions for selling Interests, including Minnick Resources Management, Inc." Pl.Ex. 1 at 4. There is no dispute that Foster actually bought his interest from Minnick. On these facts, we conclude that something more than Jesup & Lamont's apparent role as underwriter must be shown to make the firm liable under Sec. 12.
 
 
 30
 Foster presented the deposition testimony of his accountant, which tended to show something more than mere underwriter status on the part of Jesup & Lamont. Jordan's testimony was sufficient to prove that Curd reassured the accountant about Minnick even after Jesup & Lamont had withdrawn from the offering. As noted, Curd was alleged to have said "We are involved in this offering document and we know of nothing that would effect [sic] our relationship with Mr. Minnick." 3 Rec. at 195. We have carefully considered the likely impact of this statement on Foster's decision to buy, and we have concluded as a matter of law that the statement does not amount to the active participation in a sale that is necessary for Jesup & Lamont to be liable as a Sec. 12 "seller".[17]
 
 
 31
 We note that there was no direct communication between Foster and Jesup & Lamont, and that the only communication between Jesup & Lamont and the accountant, Jordan, was a single, casual comment concerning the firm's involvement with the offering and its continued good opinion of Minnick. The statement was not addressed directly to the merit of Texas Partners or to the critical question of whether to invest in the venture.
 
 
 32
 The primary role Minnick played in the transaction further persuades us that Jesup & Lamont was not a "substantial factor" in the sale. Minnick met with Foster in Alabama in the final days of 1980 to discuss Texas Partners at length. In this face-to-face meeting, Foster questioned Minnick about his background and about the proposed offering. While such an encounter is no substitute for an underwriter's independent investigation, the meeting in this case appears to have given Foster sufficient confidence in Minnick and in Texas Partners that he did not see a need to confer further with Jesup & Lamont.
 
 
 33
 Having concluded that the role of underwriter per se is not sufficient, by itself, to impose liability under Sec. 12, we also conclude on the basis of the totality of the circumstances in this case, that the very limited additional involvement in the form of the single comment to Foster's accountant is not sufficient "participation in the buy-sell transaction ... [to be] a substantial factor in causing the transaction to take place." Pharo v. Smith, 621 F.2d at 667. The extensive and active involvement in bringing about the buy-sell transaction which was present in Hill York and Junker has simply not been shown on these facts. This case is more similar to Croy v. Campbell, in which the defendant did not attempt to persuade the plaintiff to buy, and in which the plaintiff invested his money only after meeting the developer himself and otherwise obtaining independent advice. The court in Croy v. Campbell decided the defendant in that case was not a Sec. 12(2) seller, and we reach the same conclusion with respect to Jesup & Lamont in the present case.
 
 Other Federal Issues on Appeal
 
 34
 Jesup & Lamont asks us to review three of the district court's evidentiary rulings. First, the district court allowed Krebs, a former Alabama securities commissioner, to testify for Foster that customarily in a private offering the underwriter is responsible for controlling the offering documents. Krebs testified further that Jesup & Lamont had been reckless and had failed to comply with industry standards in its management of the Texas Partners documents. Jesup & Lamont argues that this testimony was not relevant to any issue before the jury and that the testimony unfairly prejudiced its case by confusing the jury.
 
 
 35
 We believe the district court did not abuse its discretion in admitting testimony about customary duties of underwriters in private offerings. The evidence concerned the manner in which offering documents are normally controlled and thus was relevant in determining whether Jesup & Lamont was a "substantial factor" in the sale, the federal standard, or whether Jesup & Lamont "materially aided" the sale, the state standard discussed below.
 
 
 36
 Jesup & Lamont also objected to the admission of Foster's testimony about reliance on Jesup & Lamont's name. We believe the testimony is relevant to whether the misrepresentation of Jesup & Lamont's role was material,[18] and we therefore conclude that its admission was not error.
 
 
 37
 Finally, Jesup & Lamont objected to limits the district court placed on its cross-examination of Foster. Jesup & Lamont sought to explore the tax motives behind Foster's investment in Texas Partners. The district court allowed Jesup & Lamont to establish that one factor motivating Foster's investment decision was anticipated tax benefits. The court prevented Jesup & Lamont from questioning Foster about the specific amounts he had deducted. We believe these rulings were well within the district court's discretion.[19]
 
 
 38
 Certification of Determinative State Law Questions
 
 
 39
 We turn therefore to the various state law claims against Jesup & Lamont since we have concluded that the firm is not subject to liability as a Sec. 12(2) seller under federal law. As noted, Counts I and II remained against Jesup & Lamont in Foster's amended complaint, and Foster alleged violations of Alabama law in each of these counts.
 
 
 40
 In Count I, Foster claimed damages for the sale of an unregistered security, which is made unlawful by Sec. 8-6-4 of the Alabama Code,[20] and which is made actionable by Sec. 8-6-19[21] ("Section 19" or "Sec. 19"). Section 19 extends liability to one who "sells or offers to sell" a security, and also to "every broker-dealer or agent who materially aids in the sale." Ala.Code Sec. 8-6-19(a), (b) (West 1984). The district court instructed the jury that "materially aided" is equivalent to "substantial factor." 4 Rec. at 489. At trial, Foster objected to this instruction. Because the jury returned a verdict in favor of Foster, that objection is moot. However, with respect to the issue of exactly how much evidence is legally sufficient to support the jury verdict, Foster contends on appeal that less participation is needed to meet Alabama's "materially aided" standard than is needed to show that a defendant was a "substantial factor" in a sale and thus a "seller" under federal law. Apparently, Foster bases his argument on the language of Sec. 19, which refers to "the nonseller who is so liable."[22] Unlike federal Sec. 12, which limits liability to sellers, the Alabama provision imposes liability on a broader range of participants in securities transactions. In this respect, Sec. 19 is similar to Sec. 11 of the 1933 Act,[23] which also lists specific participants who are subject to liability.
 
 
 41
 We have found no Alabama case discussing the level of participation required for secondary liability under Sec. 19. Because this point has become determinative in the present case, we certify the following question to the Alabama Supreme Court for instruction pursuant to Ala.R.App.P. 18:
 
 
 42
 Question One: Has a securities firm "materially aided" an unlawful sale of a security within the meaning of Alabama Code Sec. 8-6-19(b) under the following circumstances:
 
 
 43
 (a) The firm's name was displayed prominently on an offering document used in connection with the sale, and the firm was presented in the document as the issue's primary best efforts underwriter, even though the firm had withdrawn from the offering;
 
 
 44
 (b) The buyer relied on the firm's participation in the offering in reaching his decision to purchase an interest;
 
 
 45
 (c) There is substantial evidence in the record from which we must infer that the jury found that an underwriter customarily is responsible for controlling distribution of the offering documents in a private offering;
 
 
 46
 (d) The firm's president told the buyer's accountant that the firm was "involved" in the offering document after the firm had rescinded its agreement to help sell the security;
 
 
 47
 (e) The buyer did not directly communicate with the brokerage firm in reaching his decision to invest;
 
 
 48
 (f) The buyer met with the promoter of the issue to discuss the promoter's background and to discuss various business aspects of the venture before deciding to invest;
 
 
 49
 (g) The buyer delivered his check to the promoter in exchange for the security.
 
 
 50
 Count II of Foster's complaint contains two state law claims for damages based on the sale of a security by means of false written or oral communications. The first of these is grounded on Ala.Code Sec. 8-6-19(a)(2). We believe that the disposition of this Alabama claim would be determined by the same question we have certified above with respect to Foster's state law registration claim. The viability of each of these claims depends on the Alabama Supreme Court's application of the "materially aided" standard to the facts of this case.
 
 
 51
 Foster's other basis under state law for his Count II false communication claim is Ala.Code Sec. 8-6-17.[24] The district court treated this section as affording a private right of action and concluded on the basis of an analogy to federal Rule 10b-5 actions that scienter must be shown to support recovery under the section. Jesup & Lamont contends on appeal that the section does not afford a private right of action, while Foster appeals contending that an action under the section does not require scienter. We have found no Alabama case addressing either of these questions. Because they may determine Foster's right to recover if he is not successful with his other claims under Alabama law, we certify the following additional questions to the Alabama Supreme Court for instruction under Ala.R.App.P. 18:
 
 
 52
 Question Two: Does Alabama Code Sec. 8-6-17 afford a private right of action?
 
 
 53
 Question Three: If a private cause of action is available under Alabama Code Sec. 8-6-17: (a) is proof of scienter necessary to maintain the action? and (b) would severe recklessness meet the scienter requirement?[25]
 
 
 54
 The particular phrasing used in the certified questions is not to restrict the Alabama Supreme Court's consideration of the problems involved and the issues as the Alabama Supreme Court perceives them to be in its analysis of the record certified in this case.
 
 Conclusion
 
 55
 We have concluded that Jesup & Lamont was not a "seller" of an interest in Texas Partners, and consequently we reverse the district court's judgment holding the firm liable under Sec. 12(2) of the Securities Act of 1933, 15 U.S.C.A. Sec. 77l (2) (West 1981). We have certified three questions of Alabama securities law to the Supreme Court of Alabama for instruction pursuant to Ala.R.App.P. 18. Accordingly, our final decision with respect to Foster's state law claims will await answer from the Alabama Supreme Court. The several other claims on appeal are without merit.[26]
 
 
 56
 AFFIRMED in part, REVERSED in part, AND QUESTIONS OF STATE LAW CERTIFIED TO THE ALABAMA SUPREME COURT.
 
 
 57
 EXHIBIT 'A'
 TEXAS PARNTERS '80 LTD.
 Jesup & Lamont Securities Co., Inc.
 ESTABLISHED 1877
 100 Park Avenue, New York, NY 10017
TELEPHONE (212) 573-6800
 TELEX 233478 MEMBER
 62890 NEW YORK STOCK EXCHANGE, INC.
 APPENDIX A
 Selected pages from the Term Special Use Permit
-------------------------------------------------------------------------------
-------------------------------------------------------------------------------
 States Department a. Record No. (1-2) b. Region (3-4) c. Forest (5-6)
 of Agriculture
 Forest Service 7 0 Eastern 0 9 White 2 2
 - - - - - -
 Mountain
 ---------------------------------------------------------
 TERM SPECIAL USE d. District (7-8) e. User No. (9-12) f. Kind (13-15)
 PERMIT
 Andro 0 2 4007 Winter 161
 - - ---- -----
Act of March 4, Sports Resort
 1915, Sec. 7
 ---------------------------------------------------------
 (Ref. FSM 2710) g. State (16-17) h. County (18-20) k. Card No. (21)
 3 3 Coos 0 0 7 , 1
 - - - - - -
-------------------------------------------------------------------------------
 
 
 58
 Permission is hereby granted to Meadow Green - Wildcat Corporation
 
 
 59
 of Pinkham, Notch, Jackson, New Hampshire 03846, hereinafter called the permittee, to use subject to the conditions set out below, the following described lands or improvements for the period of 20 years from the date thereof:
 
 
 60
 Approximately 61 acres of portions of U. S. Tracts #16, 31, and 68 lying on the northwest slope of Wildcat Mountain near Pinkham Notch in the White Mountain National Forest as shown on Drawing No. MH-3-296,022 titled "Term & Permit Areas" and also described on two pages numbered M-11-3-302,013 titled "Term Special-Use Permit Area - Description of Tract" both prepared by E.N. Roberts, Engineer, Concord, New Hampshire, and dated "10 Sept. 1962", which drawing and description are attached and made a part of this permit, and drawings 2a, 2b, 2c, and 2d of the Wildcat General Development Site Plan (Master Development Plan) dated October 1976 by Kiley-Tyndall-Walker, which drawings are attached and made a part of this permit.
 
 
 61
 This permit covers 61 acres and is issued for the purpose of:
 
 
 62
 Construction, operation, and maintenance of a year-round outdoor recreational development to provide services necessary and desirable for the reasonable comfort and convenience of the public. Structures, facilities and appurtenant improvements to be authorized by this permit are as shown on the approved development plan as required in Clause 23.0 of this permit.
 
 
 63
 This permit is supplemented by a terminable (annual) special use permit dated 10/23/86for 842 acres for appurtenant improvements, structures, and facilities to be used in conjunction with the privileges granted by this permit.
 
 
 64
 This permit supersedes a special use permit designated 2720, Wildcat Mountain Corporation, January 10, 1974, Winter Sports Area.
 
 
 65
 1. Construction or occupancy and use under this permit shall begin
 
 
 66
 immediately. This use shall be actually exercised at least 365 days each year,
 
 
 67
 unless otherwise authorized in writing.
 
 2. SEE CLAUSE 20 FOR FEES
 
 68
 3. This permit is accepted subject to the conditions set forth herein, and
 
 
 69
 to conditions 20 to 27 attached hereto and made a part of this permit.
 
 
 70
 4. Development plans; layout plans; construction, reconstruction, or
 
 
 71
 alteration of improvements: or revision of layout or construction plans
 
 
 72
 for this area must by approved in advance and in writing by the Forest
 
 
 73
 Supervisor. Trees or shrubbery on the permitted area may be removed or
 
 
 74
 destroyed only after the Forest Officer in charge has approved, and has
 
 
 75
 marked or otherwise designated that which may be removed or destroyed.
 
 
 76
 Timber cut or destroyed will be paid for by the permittee as follows:
 
 
 77
 Merchantable timber at appraised value; young-growth timber below
 
 
 78
 merchantable size at current damage appraisal value ; provided that the
 
 
 79
 Forest Service reserves the right to dispose of the merchantable timber
 
 
 80
 to others than the permittee at no stumpage cost to the permittee.
 
 
 81
 Trees, shrubs, and other plants may be planted in such manner and in
 
 
 82
 such places about the premises as may be approved by the Forest Officer
 
 
 83
 in charge.
 
 
 84
 5. The permittee shall maintain the improvements and premises to standards
 
 
 85
 of repair, orderliness, neatness, sanitation, and safety acceptable to
 
 
 86
 the Forest Officer in charge.
 
 
 87
 6. This permit is subject to all valid claims.
 
 
 88
 7. The permittee, in exercising the privileges granted by this permit,
 
 
 89
 shall comply with the regulations of the Department of Agriculture and
 
 
 90
 all Federal, State, county, and municipal laws, ordinances, or
 
 
 91
 regulations which are applicable to the area or operations covered by
 
 
 92
 this permit.
 
 
 93
 8. The permittee shall take all reasonable precaution to prevent and
 
 
 94
 suppress forest fires. No material shall be disposed of by burning in
 
 
 95
 open fires during the closed season established by law or regulation
 
 
 96
 without a written permit from the Forest Officer in charge or his
 
 
 97
 authorized agent.
 
 
 98
 9. The permittee shall exercise diligence in protecting from damage the
 
 
 99
 land and property of the United States covered by and used in
 
 
 100
 connection with this permit, and shall pay the United States for any
 
 
 101
 damage resulting from negligence or from the violation of the terms of
 
 
 102
 this permit or of any law or regulation applicable to the National
 
 
 103
 Forests by the permittee, or by any agents or employees of the
 
 
 104
 permittee acting within the scope of their agency or employment.
 
 
 105
 10. The permittee shall fully repair all damage, other than ordinary wear
 
 
 106
 and tear, to national forest roads and trails caused by the permittee
 
 
 107
 in the exercise of the privilege granted by this permit.
 
 
 108
 11. No Member of or Delegate to Congress or Resident Commissioner shall be
 
 
 109
 admitted to any share or part of this agreement or to any benefit that
 
 
 110
 may arise herefrom unless it is made with a corporation for its general
 
 
 111
 benefit.
 
 
 112
 12. Except as provided in Clause 16 below, upon abandonment, termination,
 
 
 113
 revocation, or cancellation of this permit, the permittee shall remove
 
 
 114
 within a reasonable time all structures and improvements except those
 
 
 115
 owned by the United States, and shall restore the site, unless
 
 
 116
 otherwise agreed upon in writing or in this permit. If the permittee
 
 
 117
 fails to remove all such structures or improvements within a reasonable
 
 
 118
 period, they shall become the property of the United States, but that
 
 
 119
 will not relieve the permittee of liability for the cost of their
 
 
 120
 removal and restoration of the site.
 
 
 121
 13. This permit is not transferable. If the permittee through voluntary
 
 
 122
 sale or transfer, or through enforcement of contract, foreclosure, tax
 
 
 123
 sale, or other valid legal proceeding shall cease to be the owner of
 
 
 124
 the physical improvements
 
 APPENDIX A--Continued
 Fees
 
 125
 ----
 
 
 126
 * * *
 
 Definitions, Graduated-Rate Fee System
 
 
 * * *
 For purposes of recording and reporting sales, and sales related information including cost of sales, the activities of the concessioner are divided into:
 Service, Food. Includes the serving of meals, sandwiches, and other food materials either consumed on the premises or prepared for carryout. Snack bars are included here, as well as the sale of nonalcoholic drinks and beer served in conjunction with food.
 Merchandise: Includes the sale of miscellaneous clothing, and such items as hardware, souvenirs, and gifts. Bait, fishing rods, reels, boats, motor and boating accessories are included as well as other sporting equipment and clothing sales. Where a "Service, Car" category of business is not established by this permit, the sale of auto accessories in included in this category.
 Rental and Service: Includes the rental of ski and snow play equipment.
 Lift, Tow, and Ski Schools. Includes charges for use of all types of uphill transportation facilities and for sports lessons and training.
 
 
 [1]
 Gross Fixed Assets (GFA) The total capitalized cost of improvements, equipment, and fixtures necessary and used to generate sales and other income during the permit year on the permitted area or within the development boundary shown in this permit
 (GFA) will be established by and changed at the sole discretion of the Forest Service based on the current interpretation of guidelines supporting the Graduated Rate Fee System.
 a. Costs of the following items verified by a representative of the Forest Service to be in existence and use by the holder are included:
 (1) Identifiable structures, major equipment, such as road maintenance equipment , or land improvements which play a distinct role in generating sales.
 (2) Identifiable holder costs to provide utility services to the area. Utility services that extend beyond the development boundary may be included in GFA to the extent they are necessary for the generation of sales and are paid by the holder.
 b. Such items as the following are not a part of GFA:
 (1) Assets that ordinarily qualify for inclusion in GFA, but which are out of service for the full operating year for which fees are being determined.
 (2) Land.
 (3) Expendable or consumable supplies.
 f. Value of sales where the holder is serving as a collection or sales agent for businesses not directly associated with the permitted operation. This includes such things as bus or sightseeing-ticket sales for trips not related to activities on the permitted area, telephone- toll charges, and accident-insurance sales.
 g. Items listed in a policy statement prepared by the holder pertaining to gratuities previously approved in writing by the Forest Supervisor. The policy statement will describe how gratuities are to be recorded. A record of all gratuities shall be kept by the holder as a part of the records under this permit.
 h. Franchise receipts. Defined as amounts paid the holder by sublessees, as determined at the time franchise operations are authorized, solely for the opportunity to do business at a specific location, possibly in addition to a stated rental fee. Franchise receipts may be in the form of fixed amounts of money or reduced prices for the franchiser's product or service. No franchise operations will be undertaken until approved, in advance, by the Forest Supervisor.
 i. Commission payments received by the holder for serving as an agent or providing services such as those described in items e and f above.
 
 
 [20]
 2 Other Stipulations (Graduated-Rate Fee System)
 The annual fees due the United States for those activities authorized by this permit shall be calculated on sales according to the schedule below.
 --------------------------------------------------------------------------
 Break-even point Balance of
Kind of Business (Sales to GFA) Rate Base Sales Rate
 (Percentage) (Percentage) (Percentage)
--------------------------------------------------------------------------
Service, food 70 1.25 1.50
Merchandise 70 1.50 1.80
Rentals and Services 30 4.50 5.95
Lifts, Tows, and Ski Schools 20 2.00 5.00
--------------------------------------------------------------------------
 A weighted-average break-even point (called the break-even point) and a weighted-average rate base (called the rate base) shall be calculated and used when applying the schedule to mixed business. If the holder's business records do not clearly segregate the sales into the business categories authorized by this permit they will be placed in the most logical category. If sales with a different rate base are grouped, place them all in the rate category that will yield the highest fee. Calculate the fee on sales below the break-even point using 50 percent of the rate base. Calculate the fee on sales between the break-even point and twice the break-even point using 150 percent of the rate base. Calculate the fee on sales above twice the break-even point using the balance of sales rate.
 (4) Intangible assets, such as goodwill, organization expense, permit value, and liquor licenses.
 (5) Improvements not related to the operation.
 (6) Luxury improvements not used to generate sales.
 (7) Improvements not located on the permit sites within the development boundary (except for utility identified in (2).)
 (8) Expensed assets.
 (9) Assets owned by and leased from others.
 As of April 30, 1986 the initial GFA under this ownership has been determined to be $5,049,853 as shown in detail on attached schedule, 1, "Gross Fixed Assets". If an error is found in the GFA amount, it shall be changed to the correct amount retroactive to the date the error occurred.
 
 
 [2]
 Sales For the purpose of fee calculation include (1) revenues derived from all goods and services sold which are related to operations under this permit and (2) the value of gratuities not excluded by item g. Gratutities include such goods, services, or privileges as discounts, gifts, dividends, or benefits that are furnished to such individuals as stockholders, owners, creditors or other obligees, officers, employees or their families, at rates or under conditions not available to the general public. Such gratuities shall be sales-priced by the Permittee at the current price to the public
 The following items shall be excluded from gross receipts or revenue to arrive at sales:
 a. Refunds from returned merchandise and receipts from sales of real and nonrental personal property used in the operation. Sales of property, such as rental equipment, previously used for generating operating revenue, when sold on the premises, shall be included in gross receipts. Examples of this are such rental items as boats, motors, skis, or boots, which may be sold periodically and replaced. If such equipment is traded in or sold off premises, the value or revenue shall be excluded from sales.
 b. Rents paid to the holder by sublessees, even if based on sales. (The gross sales of sublessees are included as provided under item (1). )
 c. Amounts received for goods sold, services rendered, or privileges granted at a price lower than the holder's current price to the public. (The full value is included as provided under item (2).)
 d. Sales taxes and Federal and State gasoline taxes collected from customers that were paid or are payable directly to taxing authorities.
 e. Amounts paid or payable to a Government licensing authority or recreation administering agency from sales of hunting or fishing licenses and recreation fee tickets.
 26614 This permit supercedes a special-use permit designated: Winter Sports Resort. Wildcat Mountain Corporation, dated 1/10/74.
 
 
 [15]
 Permit Termination
 Unless sooner terminated or revoked by the authorized officer, in accordance the provisions of the authorization, this authorization shall expire and become void on July 31, 2006, but a new special-use authorization to occupy and use the same National Forest System land may be granted provided the holder will comply with the then-existing laws and regulations governing the occupancy and use of National Forest lands and shall have notified the authorized officer not less than 30 days prior to said date that such new authorization is desired.
 
 
 [27]
 0 Supplemental Permit
 This permit is supplemented by a terminable (annual) special use permit dated -------- for 842 acres for appurtenant improvements, structures, and facilities to be sued in conjunction with the privileges granted by this permit.
 ACKNOWLEDGMENT
 This Permit will have no force and effect until the permittee has signified acceptance of its provisions and conditions by signing below and returning the duplicate copy to the Forest Supervisor.
 U.S. DEPARTMENT OF AGRICULTURE
 FOREST SERVICE
 10/23/86 /s/ signature
------------------------------------ -----------------------------------------
 Date MICHAEL B. HATHAWAY
 Forest Supervisor
 The undersigned authorized official of Meadow Green - Wildcat Corporation has
 read the foregoing permit and agrees for and in behalf of said corporation that
 it accepts and will abide by its terms and conditions.
 10/23/86 Meadow Green Wildcat Corporation
------------------------------------ -----------------------------------------
 Date
 By /s/ signature
 ---------------
 Title Pres
 ---------------
I, __________, Certify that I am the Secretary of the Meadow Green - Wildcat
Corporation named as permittee herein; that _______________ who signed
said permit on behalf of said corporation, was then __________ of said
corporation that said permit was duly signed, for and in behalf of said
 corporation
by authority of a resolution adopted by its Board of Directors on the
________ day of ________, 19__.
 -----------------------------------------
(SEAL) Secretary
APPENDIX B
Selected pages from the Forest Service Manual
 2715.14c--4
 TITLE 2700 - SPECIAL USE MANAGEMENT
 b. Include language in permits and disallow existing or new expensed and expensed leased assets (operating leases) in GFA in all new perm its; renewal of existing expired permits; and when amending existing permits to authorize major expansions and capital investment, boundary and modifications, or other significant changes in the authorizations (FSH 2709.11. sec. 53.1).
 c. GFA will change annually, as appropriate, at the time of fee calculation to recognize additions, deletions, or capitalized modernization. Require holders to submit documentation of such changes along with their annual operating statement.
 d. Sample GFA Determinations. There follow a timespread table, or chart, demonstrating graphically the setting of GFA in 13 representative situations, and some notes explaining the actions indicated by the chart.
 The table represents a hypothetical time interval between the "START" (sometime in the past and "NOW.") There are 14 horizontal lines on the chart extending from the "START" of the time interval until the end (NOW). The top line indicates that during the time interval the cost of construction, as indicated by the Department of Commerce Construction Cost Index, increased by 50 percent; for example, it would cost $150,000 NOW to replace an item which has been fully maintained and which was constructed at the START for $100,000.
 The next 13 lines represent the life histories of 13 different but representative permit situations. Indicated are construction cost, change in ownership, losses, additions, and modernizations--all things that might affect GFA. Some basic assumptions are that (a) acceptable cost records are available, (b) the original cost in each situation is the same, $100,000, and (c) all normal necessary maintenance has been carried out.
 In the example, the permits are coming under GRFS NOW for the first time because of periodic fee review, issuance of a new permit after termination of a previous one, or a new permit is being issued as a result of sale of the improvements. It is, therefore, necessary to establish GFA for the first time for each of the situations.
 *-FSM 12/86 AMEND 89-*
 2715.14c--5
 TITLE 2700 - SPECIAL USES MANAGEMENT
 DETERMINING GFA IN REPRESENTATIVE SITUATIONS
-------------------------------------------------------------------------------
SITUA- START NOW GFA
 TION -------- -------
 $100,000 -------->
 Increased value, per Const. Cost Index --------> $150,0-
 00
-------------------------------------------------------------------------------
 Sale
 1. $100,000 0 -$150,0-
 00
 $150,0-
 00
 Sale
 2. 100,000 0 --120,0-
 00
 120,000
 Sale Sale
 3. 100,000 0 0 --120,0-
 00
 80,000 120,0- Sale
 00
 4. 100,000 0 --150,0-
 00
 200,000
 5. 100,000 --100,0-
 00
 Expansion
 6. 100,000 0 --150,0-
 00
 50,000 Expansion Fire Loss
 7. 100,000 0 - --150,0-
 00
 100,000 50,000
 Sale Sale
 8. 100,000 0 0 --150,0-
 00
 120,000 150,000 Forced
 Sale
 9. 100,000 0 --100,0-
 00
 50,000
 Sale Sale
 10. 100,000 0 0 --100,0-
 00
 75,000 100,000
 Sale Sale Sale Sale
 11. 100,000 0 0 0 0 --150,0-
 00
 120,000 150,000 180,000 200,000
 Expansion Expansion Sale See
 12. 100,000 k k 0 --Narra-
 tive
 100,000 50,000 300,000
 Fire Loss Fire Loss Improvement Sale See
 13. 100,000 - - k 0 --Narra-
 tive
 25,000 30,000 75,000 200,000
-------------------------------------------------------------------------------
 FSM 12/86 AMEND 89
2715.14c--6
 TITLE 2700 - SPECIAL USES MANAGEMENT
 Situation 1. Sold now for $150,000. Construction Index shows today's cost at $150,000, so full credit is given for the sale price and GFA is pegged at $150,000.
 Situation 2. Sold now for $120,000. Construction Index shows today's cost at $150,000. However, as credit can only be given for actual investment, GFA is pegged at the sale price of $120,000
 Situation 3. Sold some time ago for $120,000. Previous sale of $80,000 has no bearing so GFA is pegged at $120,000, the actual investment of the current permittee.
 Situation 4. Sold now for $200,000. Construction Index shows today's cost at $150,000. GFA cannot be credited at more than adjusted value regardless of price paid. So GFA is pegged at $150,000.
 Situation 5. Original developer is still the permittee. $100,000 is all the money he has invested in qualifying GFA items. GFA is, therefore, $100,000.
 Situation 6. Original developer is still the permittee. He spent an additional $50,000 for expansion. He is credited with the added cost so GFA is $150,000.
 Situation 7. Original developer is still the permittee. He spent an additional $100,000 to bring total cost up to $200,000. However, he suffered a $50,000 loss and has not yet replaced the destroyed structures. GFA can only reflect actual sales producing items, so GFA is $200,000 less $50,000 or $150,000.
 Situation 8. Sold some time ago for $150,000. While this is more than it was worth then, it is the permittee's investment and is worth that much now, so GFA is $150,000.
 Situation 9. Mortgage was foreclosed and sold for $50,000. The full original cost not adjusted to the present date would be allowed
 2715.14c--7
 Situation 10. Sold now for $100,000. Past sales have no bearing. Even though the Construction Index indicated today's cost is $150,000 this is $50,000 in excess of today's sale price. $100,000 is creditable to GFA.
 Situation 11. Sold now for $200,000. Past record shows sales at progressively higher than the original $100,000 cost. However, they have no bearing. As Construction Index value is $150,000 that is all that may be allowed. GFA is $150,000.
 Situation 12. Sold now for $300,000. On two occasions, expansion projects were carried out, one of $100,000 and the other $50,000. In determining GFA the original $100,000 would provide credit of $150,000 today. The Construction Index change between the date of each expansion and now would be used to determine today's cost of the expansion of added items. These steps are necessary before it can be determined what part of the $300,000 sale price would be credited to GFA.
 Situation 13. Sold now for $200,000. GFA today would reflect the initial cost less $55,000 losses with the difference adjusted per Construction Cost Index today. The $75,000 would be adjusted by the Index change between its date of expenditure and today. GFA today would then be the sum of the adjusted remainder of original cost plus adjusted cost on the subsequent improvement.
 FSM 12/86 AMEND 89
 APPENDIX
 UNITED STATES DISTRICT COURT
 DISTRICT OF MASSACHUSETTS
Civil Action Nos.
84-2586-Y
84-3241-Y
 VERANDA BEACH CLUB LIMITED
 PARTNERSHIP, ET AL.
 Plaintiffs
 v.
 WESTERN SURETY COMPANY, ET AL.
 Defendants
 QUESTIONS TO BE ANSWERED BY THE JURY
-------------------------------------------------------------------------------
 1. DID THE DEFENDANT, ROBERT F. MONGILLO, BREACH A CONTRACT TO PROVIDE A
 VALID BOND WITH EITHER OR BOTH OF THE PLAINTIFFS?
 YES X NO
 ____ ____
 1a. IF YOUR ANSWER TO QUESTION NUMBER 1 IS IN THE NEGATIVE BECAUSE YOU HAVE
 DETERMINED THAT THERE WAS NO CONTRACT FOR WANT OF AN OFFER AND ACCEPTANCE, OR
 FOR WANT OF CONSIDERATION, SHOULD THE DEFENDANT ROBERT MONGILLO BE
 ESTOPPED--THAT IS PRECLUDED--FROM AVOIDING HIS PROMISE TO PERFORM UNDER THE
 DOCTRINE OF PROMISSORY ESTOPPEL AS THAT DOCTRINE HAS BEEN PREVIOUSLY
 EXPLAINED?
 YES____ NO____
 2. DID THE DEFENDANT, ROBERT F. MONGILLO, MAKE FRAUDULENT OR NEGLIGENTLY
 FALSE PROMISES TO PROVIDE A VALID BOND TO EITHER OR BOTH OF THE PLAINTIFFS?
 YES X NO
 ____ ____
 [IF ANSWERS TO QUESTIONS NUMBERED 1, 1a AND 2 ARE ALL IN THE NEGATIVE, THE
 FOREPERSON SHALL SIGN AND DATE BELOW, AND SHALL SIGN VERDICT SLIP NUMBER 1
 AND SHALL PROCEED NO FURTHER: OTHERWISE, THE QUESTIONS BELOW, TO THE EXTENT
 APPLICABLE, SHALL BE ANSWERED, AND THIS QUESTION SLIP SHALL THEN BE SIGNED
 AND DATED BY THE FOREPERSON)
 3. IF THE ANSWER TO QUESTION NUMBER 1 OR 1a IS IN THE AFFIRMATIVE, DID THE
 DEFENDANT ROBERT F. MONGILLO ENTER INTO THE CONTRACT O R MAKE THE PROMISE
 WITH THE APPARENT AUTHORITY OF HIS PRINCIPAL, THE DEFENDANT WESTERN SURETY
 COMPANY?
 YES X NO
 ____ ____
 4. IF THE ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVEm DID THE
 DEFENDANT ROBERT F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENTLY FALSE
 PROMISES WITH AN INTENT OR PURPOSE, AT LEAST IN PART, TO SERVE HIS PRINCIPAL,
 THE DEFENDANT WESTERN SURETY COMPANY?
 YES NO X
 ____ ____
 4a. IF THE ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID THE
 DEFENDANT, ROBERT F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENTLY FALSE
 PROMISES WITH THE APPARENT AUTHORITY OF HIS PRINCIPAL, THE DEFENDANT WESTERN
 SURETY COMPANY?
 YES X NO
 ____ ____
 5. IF YOUR ANSWER TO QUESTION NUMBER 1, 1a OR TO QUESTION NUMBER 2 IS IN THE
 AFFIRMATIVE, WHAT DAMAGES DO YOU FIND THAT PLAINTIFF HAVE SUSTAINED?
 $ 2.3 million
 6. IF YOUR ANSWER TO QUESTION NUMBER 1, 1a, OR TO QUESTION NUMBER 2 IS IN
 THE AFFIRMATIVE, DID PLAINTIFF FRG., INC. AND FANEUIL HALL CAPITAL GROUP,
 INC., ENTER INTO A CONTRACT, THE TERMS OF WHICH PROVIDED THAT EACH WAS JOINT
 VENTURER IN THE ACQUISITION OF THE VERANDA BEACH CLUB PROPERTY?
 YES NO X
 ____ ____
 7. IF YOUR ANSWER TO QUESTION NUMBER 6 IS IN THE AFFIRMATIVE, AND IF YOUR
 ANSWER TO QUESTION NUMBER 1 OR QUESTION NO. 1a IS IN THE AFFIRMATIVE, DID
 ROBERT F. MONGILLO INTEND FANEUIL HALL CAPITAL GROUP, INC., TO BE THE
 INTENDED BENEFICIARY OF HIS PROMISE?
 YES NO X
 ____ ____
 8. IF YOUR ANSWER TO QUESTION NUMBER 6 IS IN THE AFFIRMATIVE, AND IF YOUR
 ANSWER TO QUESTION NUMBER 2 IS IN THE AFFIRMATIVE, DID THE DEFENDANT ROBERT
 F. MONGILLO MAKE THE FRAUDULENT OR NEGLIGENT MISREPRESENTATIONS UNDERSTANDING
 THAT FANEUIL HALL CAPITAL GROUP, INC., WAS A PRINCIPAL IN THE VERANDA BEACH
 PROPERTY ACQUISITION, AND NOT MERELY AN AGENT FOR FRG, INC., AND/OR VERANDA
 BEACH CLUB LIMITED PARTNERSHIP?
 YES NO X
 ____ ____
 10. IF YOUR ANSWER TO QUESTION NUMBER 7 OR TO QUESTION NUMBER 8 IS IN THE
 AFFIRMATIVE, WHAT PORTION OF THE DAMAGES SET FORTH IN YOUR ANSWER TO QUESTION
 NUMBER 5 SHALL BE AWARDED TO EACH:
 FRG, INC. $__________________________________________________
 FANEUIL HALL CAPITAL $__________________________________________________
 GROUP, INC.
 /s/ signature
 ----------------------------------------------------
 FOREPERSON
 NOTE: These are the special questions and the answers thereto as originally
 returned by the jury. After redeliberation, all answers remained the same,
 except that the jury answered Questions No. 3 and 4a in the negative rather
 than in the affirmative.
 DISTRICT OF MASSACHUSETTS
 Civil Action Nos.
 84-3241-Y
 VERANDA CLUB LIMITED
 PARTNERSHIP, ET AL.
 Plaintiffs
 v.
 WESTERN SURETY COMPANY, ET AL.
 Defendants
 VERDICT SLIP NO. 2
 
 
 
 127
 We, the Jury, on the claims brought by the plaintiffs against defendants in the above entitled case, find for the plaintiff(s)F.R.G. Inc. and ____________________ and against defendant(s) Robert F. Mangillo and ____________________ in amount of $ 2.3 million.
 
 
 128
 /s/ signature
 
 
 
 DATED:OCTOBER 13, 1989
 NOTE: This is the verdict as returned by the jury on both occasions (originally and after redeliberation).
 
 
 *
 Honorable C. Clyde Atkins, U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 15 U.S.C.A. Sec. 77l (2) (West 1981)
 
 
 [2]
 The actual drilling operations contemplated were to have been undertaken by Pyron Exploration and Drilling Corp., another Texas entity in which Minnick was involved. Each of the four--Texas Partners '80, Ltd.; Minnick; Minnick Resources Management, Inc.; and Pyron Exploration and Drilling Corp.--were named as defendants in Foster's securities action in the district court. None of the four filed responsive pleadings, and default judgments were entered against them. All four filed notices of appeal, but their appeals were subsequently dismissed for want of prosecution
 
 
 [3]
 See Exhibit A to this opinion
 
 
 [4]
 The record does not fix the date of rescission precisely, but Curd testified that the agreement was to expire on August 30, which was "right around this time [i.e. the time of rescission]." 4 Rec. at 349
 
 
 [5]
 15 U.S.C.A. Sec. 77e (West 1981)
 
 
 [6]
 Id. at Sec. 77l (1)
 
 
 [7]
 Id. at Secs. 77q, 77l (2)
 
 
 [8]
 15 U.S.C.A. Sec. 78j(b) (West 1981)
 
 
 [9]
 17 C.F.R. Sec. 240.10b-5 (1984)
 
 
 [10]
 As relevant here, the jury found that Jesup & Lamont had materially aided in the sale of unregistered securities to Foster, and that Jesup & Lamont was a substantial factor in the sale of a security to Foster. 4 Rec. at 513-14
 
 
 [11]
 We postponed ruling on Foster's motion to dismiss appeal No. 83-7573, which was based on the ground that the judgment appealed from is not a final judgment. Foster argues that the district court's judgment of September 30, 1983, is not a final judgment because the question of attorneys' fees was not decided. See, e.g., C.I.T. Corp. v. Nelson, 743 F.2d 774 (11th Cir.1984); McQurter v. City of Atlanta, 724 F.2d 881, 882 (11th Cir.1984). We note, however, that the district court entered an order awarding attorneys' fees on March 16, 1984, and that both Foster and Jesup & Lamont filed timely notices of appeal from that order. Given this state of the record, we conclude that the jurisdictional challenge to Jesup & Lamont's appeal is moot, and consequently we do not address it
 
 
 [12]
 15 U.S.C.A. Sec. 77l (2) (West 1981)
 
 
 [13]
 Foster has not alleged that Jesup & Lamont "controlled" Minnick within the meaning of Sec. 15 of the Securities Act of 1933, 15 U.S.C.A. Sec. 77o (West 1981), nor has Foster alleged that Jesup & Lamont actually made the sale acting as Minnick's agent. See Murphy v. Cady, 30 F.Supp. 466, 469-70 (D.Me.1939). We are required to look beyond these basic amplifications of Sec. 12(2) to assess Jesup & Lamont's potential liability in the present case
 
 
 [14]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. Id. at 1209
 
 
 [15]
 The SEC has recognized the heightened importance of underwriters in new high-risk ventures:
 By associating himself with a proposed offering, an underwriter impliedly represents that he has made [a due diligence] investigation in accordance with professional standards. Investors properly rely on this added protection which has a direct bearing on their appraisal of the reliability of the representations in the prospectus.
 Securities Act of 1933 Release No. 5275 (July 26, 1972) (quoting The Richmond Corp., 41 S.E.C. 398, 406 (1963)). As one court has observed, "Prospective investors look to the underwriter--a fact well known to all concerned and especially to the underwriter--to pass on the soundness of the security and the correctness of the registration statement and prospectus." Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973); see also Escott v. Barchris Construction Corp., 283 F.Supp. 643, 696 (S.D.N.Y.1968) ("prospective investors rely upon the reputation of the underwriters in deciding whether to purchase the securities."). Furthermore, we do not believe the identity of the underwriter is important to investors only in registered offerings.
 
 
 [16]
 Section 11 applies only to issues for which a registration statement is in effect, and thus does not apply in this case. Section 12, by contrast, applies whether or not an issue is exempt from registration
 
 
 [17]
 We do not suggest that the statement, under all the other circumstances of this case, would not support liability under some other provision of law, such as Sec. 10(b) of the 1934 Act or common law deceit. We are only called upon here, however, to consider whether Jesup & Lamont was a "seller" under Sec. 12 of the 1933 Act
 
 
 [18]
 Cf. TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (in proxy setting, "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."); see also SEC v. Carriba Air, Inc., 681 F.2d 1318, 1323 (11th Cir.1982) ("The test for determining materiality is whether a reasonable man would attach importance to the fact misrepresented or omitted in determining his course of action.")
 
 
 [19]
 We need not address Foster's contention on appeal that the district court was incorrect to apply the Alabama statutory rate in awarding prejudgment interest. Our disposition of Foster's federal Sec. 12(2) claim leaves only state law claims as possible bases of liability. We consequently find no error in the district court's use of the state statutory rate
 
 
 [20]
 Ala.Code Sec. 8-6-4 (Michie 1984)
 
 
 [21]
 Id. at Sec. 8-6-19
 
 
 [22]
 Alabama Code Sec. 8-6-19(b), in its entirety, reads:
 Every person who directly or indirectly controls a seller liable under subsection (a) of this section, every partner, officer or director of such a seller, every person occupying a similar status or performing similar functions, every employee of such a seller who materially aids in the sale and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.
 
 
 [23]
 15 U.S.C.A. Sec. 77k (West 1981)
 
 
 [24]
 Ala.Code Sec. 8-6-17 (Michie 1984). This section too may have analogues in federal law. An Alabama court has observed in a criminal case that Sec. 8-6-17 is "virtually identical" with the language of Rule 10b-5. Buffo v. State, 415 So.2d 1158, 1162 (Ala.1982). We pause only to note that the Alabama section is also similar to Sec. 17(a) of the 1933 Act, 15 U.S.C.A. Sec. 77q(a) (West 1981), which is perhaps not surprising given the similarity between the two federal provisions
 
 
 [25]
 Special interrogatory number ten asked "Has the Plaintiff proved by a preponderance of the evidence that Jesup & Lamont engaged knowingly in misconduct or acted with severe recklessness?" The jury answered "Yes." See 4 Rec. at 515, line 17. We note that if Foster's recovery is supported under the "materially aided" standard of Ala.Code Sec. 8-6-19, the Supreme Court of Alabama may find it unnecessary to reach questions Two and Three concerning Ala.Code Sec. 8-6-17. Similarly, the Alabama Supreme Court may find it unnecessary to decide whether Ala.Code Sec. 8-6-17 requires scienter if the court determines that the special interrogatories established sufficient scienter assuming arguendo that scienter is required. See 4 Rec. at 515, lines 17-20. The Supreme Court of the United States has reserved decision on whether recklessness is sufficient to establish scienter. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976); Aaron v. SEC, 446 U.S. 680, 686 n. 5, 100 S.Ct. 1945, 1950 n. 5, 64 L.Ed.2d 611 (1980). Some circuit courts of appeal have held that recklessness will support an action under Rule 10b-5. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44 (2d Cir.1978)
 
 
 [26]
 Foster has appealed from the district court's award of attorneys' fees. We express no opinion about attorneys' fees at this time, but will address the question as necessary after the Alabama Supreme Court has instructed us on the underlying state law issues